**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aloe Vera of America, Inc., et. al., ) | No. CV 99-1794-PHX-JAT |
| ) | |
| Plaintiffs, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| United States of America, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Pending before this Court are the Yamagata Plaintiffs' Motion for Partial Summary Judgment Regarding Liability (Doc. #480), the Maughan Plaintiffs' Motion for Partial Summary Judgment (Doc. #482), and Defendant United States of America's Motion for Summary Judgment (Doc. #485). The Court now rules on the Motions.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from certain disclosures made by the Internal Revenue Service to the Japanese National Tax Administration (NTA). The United States made these disclosures pursuant to a convention with Japan that allows the exchange of information in revenue collection effort. Following these disclosures, stories appeared in the Japanese media regarding the joint examination of Plaintiffs by the IRS and the NTA. The articles about Plaintiffs contained information that was at least partially false.

Plaintiffs argue that the information disclosed by the United States to the NTA was not an "authorized disclosure" under federal law; and, therefore, Plaintiffs are entitled to

damages for Defendant's breach of confidentiality. Plaintiffs filed this suit on October 6, 1999. Defendant filed its first Motion to Dismiss in December 1999, claiming lack of subject matter jurisdiction and failure to state a claim. The Court granted the motion to dismiss Plaintiffs' Complaint on statute of limitations grounds with leave to amend, but denied the motion on all other grounds. Specifically, with regard to Count II, the Court found that if the "IRS knew or should have known, based on the alleged prior history of mutual relations with the NTA, that the latter routinely failed to comply with the terms and conditions of secrecy mandated by the Convention, the IRS's disclosure of any return information . . . to the NTA was not authorized by the Convention or by the statute." (Doc. #26)

Plaintiffs filed their First Amended Complaint on October 6, 2000. Defendant filed a motion to dismiss the amended complaint in November of 2000. On June 18, 2001, the Court denied the motion to dismiss, but specifically refrained from ruling on whether Plaintiffs stated a claim "by alleging that false information cannot be pertinent information." (Doc. #65). Plaintiffs have amended their Complaint twice more since the June 18, 2001 Order.

**II.   Analysis and Conclusion**

A.   Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment is mandated, "...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more

1 than simply show that there is some metaphysical doubt as to the material facts" by
2 "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"
3 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting
4 Fed. R. Civ. P. 56(e)).  A dispute about a fact is "genuine" if the evidence is such that a
5 reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,*
6 *Inc.*, 477 U.S. 242, 248 (1986).  The non-movant's bare assertions, standing alone, are
7 insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.*
8 at 247-48.  However, in the summary judgment context, the Court construes all disputed facts
9 in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072,
10 1075 (9th Cir. 2004).

    B.    Count I

All Plaintiffs have moved for partial summary judgment on Count I.  Defendant also moves for summary judgment on Count I.  In Count I, Plaintiffs allege the Defendant violated 26 U.S.C. §6103(a) by providing false information to the NTA.  Plaintiffs base their motions on two allegedly false statements: 1) the IRS's Simultaneous Examination Proposal (SEP) estimated that Plaintiffs Aloe Vera of America and Rex G. Maughan had unreported income in the United States from Japan-related transactions for the years 1991 and 1992 of $32,116,000;[1] and 2) notes of a presentation to the NTA stating that although the cost of the aloe vera product to FLP Japan Ltd. (FLPJ), Plaintiffs' distributing entity in Japan, varied over the years, the commissions paid to Plaintiffs Maughan and Gene Yamagata remained the same.

26 U.S.C. §6103(a) prohibits employees of the United States from disclosing any tax return or return information obtained in the course of their employment.  26 U.S.C.

---

[1]Defendant argues the Court should not allow Plaintiffs to introduce evidence of the first alleged false statement because Plaintiffs did not specifically list the statement in their Third Amended Complaint.  Plaintiffs counter that they timely and properly disclosed the false statement to Defendant during discovery and that notice pleading allows for factual development of claims.  The Court will overrule Defendant's objection.

§743(a)(1) provides a private cause of action for taxpayers whose confidential tax information has been wrongfully disclosed. Section 6103 provides several exceptions to the general non-disclosure rule. The exception relevant to this case, section 6103(k)(4), reads:

> A return or return information may be disclosed to a competent authority of a foreign government which has an income tax or gift and estate tax convention, or other convention or bilateral agreement relating to the exchange of tax information, with the United States but only to the extent provided in, and subject to the terms and conditions of such convention or bilateral agreement.

The United States has an income tax treaty with Japan. Article 26 of the US/Japan Income Tax treaty provides that the competent taxing authorities of the United States and Japan "shall provide such information as is pertinent to carrying out the provisions of this Convention or preventing fraud or fiscal evasion in relation to the taxes which are the subject of this treaty." Defendant claims that the 6103(k)(4) exception covers both allegedly false statements because it provided tax return information in the SEP to Japan pursuant to the US/Japan tax treaty. Plaintiffs argue that the false disclosures do not fall under the exception because false information could never be pertinent to carrying out the treaty; and, that relevance is a term or condition of the treaty.

The Court notes that Plaintiffs survived a motion to dismiss by arguing that false information constitutes return information under 26 U.S.C. §6103(b)(2)(A). In its September 20, 2000 Order the Court held that because the information the IRS allegedly disclosed to the NTA was prepared by the Secretary with respect to the determination of the possible existence of tax liability, the information constituted "return information" within the definition of §6103(b)(2)(A). Section 6103(k)(4) allows the IRS to disclose "return information" to treaty partners like Japan. Plaintiff nonetheless claims that the IRS cannot disclose false information, i.e., tax information, because false information could never further the purposes of a tax treaty.[2]

---

[2] The Court is not convinced that false information can never further a joint project. For example, a partner at a law firm tells a junior associate that the partner promised to give a draft of a summary judgment motion to the client by Tuesday. In fact, the partner knew she did not have to give a draft to the client until Wednesday. Because the partner gave a false

- 4 -

The United States urges the Court to adopt an expansive view of the tax treaty exception. Defendant argues that the US-Japan Tax Convention authorizes the broad disclosure of return information and that the Convention does not require the accuracy of the information exchanged. And that the treaty requires the IRS to transmit any information that is relevant.

The Court finds that the tax treaty exception of §6103(k)(4) should be interpreted very broadly. *See Bacardi Corp. of America v. Domenech*, 311 U.S. 150, 163 (1940) (stating, "[Courts] should construe the treaty liberally to give effect to the purpose which animates it."). Free and open disclosure best serves the purposes of tax treaties - - ensuring that taxpayers correctly report and pay their domestic and foreign taxes. To require the United States to guarantee the accuracy of all information conveyed to treaty partners, especially in the preliminary stages, would have a chilling effect on furthering the purposes of the treaty. The IRS would not propose simultaneous examinations for fear of lawsuits for any misinformation contained in the proposal.

While deliberately providing knowingly false information to a tax treaty partner might serve as the basis for a cause of action under 26 U.S.C. §743(a)(1), the Court does not need to reach that question in this case. Plaintiffs have presented evidence that creates a fact issue regarding whether the Defendant negligently conveyed incorrect information to the NTA, but not evidence that demonstrates a deliberate attempt by the IRS to provide false information to the NTA. The Court holds that negligently providing incorrect information in the course of a simultaneous examination does not rise to the level of actionable conduct.

Estimate of Unreported Income

The IRS included in section III of its SEP an estimate of Plaintiffs' potential unreported income, referring back to the issues in section II, which addressed royalty and commission expenses and other issues. Plaintiffs claim that Defendant had finished its audit

---

deadline, she had more time to review the draft and improve it. And the client received a better product. This is one example where providing false information furthered a project.

- 5 -

1 of Plaintiffs before sending the SEP and knew that Plaintiffs had reported the
2 royalty/commissions income for 1991 and 1992, but included the estimate to bias the NTA
3 against Plaintiffs. Plaintiffs note that the amount of estimated unreported income for 1991
4 and 1992 equals exactly the royalty amounts disallowed as expenses by the IRS.

5 Defendant emphasizes that this was merely an estimate, and an estimate, by its nature,
6 is neither false nor true. The Yamagata Plaintiffs counter by citing a case that stated an
7 estimate without any basis can constitute a falsehood. The case, *Harrison v. Westinghouse*
8 *Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999), is distinguishable. That case involved
9 estimates submitted with contract bids, bids that the parties relied on to award contracts.

10 The Court agrees with Defendant that an estimate under these circumstances cannot
11 be categorized as either false or true; it is just a prediction. If the IRS estimates a taxpayer
12 will owe a certain amount, but the actual amount owed is either higher or lower, does that
13 make the original estimate a falsehood, or just an inaccurate forecast? The Court finds the
14 latter.

15 International Examiner Rick Smith could not remember how he chose the estimate,
16 but stated that the IRS had concerns other than the payment of royalties and commissions
17 from FLPJ to Aloe Vera of America, Inc. (AVA), including whether Plaintiffs had set up
18 another tax conduit entity like Batrax. Section II, to which Section III referred, listed more
19 issues than just the royalties and commissions. Plaintiffs point out that the note in section
20 three specifically mentions royalty and commission payments and that the estimates equaled
21 the amounts of royalty and commission payments in question.

22 Regardless of whether the estimate of unreported income equaled the amounts of
23 commissions and royalties disallowed, the fact remains that the estimate was just that - an
24 estimate. When taxpayers file for an extension on their income taxes, they have to make a
25 payment of estimated tax. If they overpay, they are not liable for the amount of their
26 estimate, the IRS has to refund the overpayment. The Court finds that in the tax context, an
27 estimate cannot serve as a predicate for liability for a knowingly false disclosure.

28

Commission vs. Price

The second alleged false statement involves notes from an IRS presentation to the NTA allegedly concerning commissions paid to Maughan and Yamagata on AVA sales of aloe vera products to FLPJ verses the cost of the products. IE Smith made a presentation to the NTA regarding the commission issue and other issues in August of 1996. Manager Pat Sturgis's notes of the meeting state that the cost of the product to Japan from AVA changed over the years from over $30 to $15, approximately, but the commissions always stayed the same at $8.10. Manager Sturgis testified that her notes regarding the specific statement in question were "poor" and she didn't know whether she understood what Smith was saying. She was taking notes strictly for her own benefit. IE Smith testified that he did not remember making the statement Sturgis attributed to him.

Analyst Sally Warner also took notes at the meeting. Her notes state, "through the years the sales price of the product changed quite a bit. The commission always stayed the same." It is unclear whether this note refers to sales to FLPJ. And the fax transmitting Warner's notes reads, "Attached are the notes that I took during the meeting. As you will be able to see, there are some weak spots and I did miss parts of the second day and the last day." Warner testified that she emphasized recording what the NTA wanted, not what the U.S. representatives were saying.

The evidence shows that from 1985 to 1989 both the cost of the product and the commissions changed, but the commissions did stay the same in 1987, 1988, and 1989, despite changes in cost from 1987 to 1988.[3] So, if they describe the cost of sale from AVA to FLPJ, the two sets of notes would be inaccurate except for the years 1987 and 1988. But the Court is not willing to hold the United States liable for intentional falsehoods based on notes taken by two different attendees of a meeting - attendees who admitted to the weakness of their notes.

---

[3]Costs remained the same in 1988 and 1989.

1  The Court will not impose liability on the United States for intentional disclosure of false information based on a tax estimate included in the SEP or the presentation notes taken by attendees who both questioned the reliability of their notes. The Court therefore grants summary judgment to Defendant on Count I.

### C. Count II

Defendant has also moved for summary judgment on Count II. In Count II of the Complaint, Plaintiffs claim that Defendant violated section 6103 by providing confidential tax information, whether false or true, to the NTA because the IRS knew or should have known that the NTA would leak the information. Defendant argues that it has no duty to ensure that the NTA maintains the confidentiality of the information provided by the U.S. pursuant to the U.S./Japan treaty. The Court has twice rejected this argument, and does so again.

In its September 20, 2000 Order, the Court found, "if as Plaintiffs allege, the IRS knew or should have known, based on the alleged prior history of mutual relations with the NTA, that the latter routinely failed to comply with the terms and conditions of secrecy mandated by the Convention, the IRS's disclosure of any return information - - whether true or false - - to the NTA was not authorized by the Convention or by the statute." Pursuant to that Order, to survive summary judgment on Count II, Plaintiffs must set forth specific facts demonstrating a genuine issue regarding whether: 1) the IRS knew or should have known prior to the October 1997 leaks of Plaintiffs' tax information that the NTA *routinely* leaked tax treaty information; and 2) the NTA actually leaked the news stories involving Plaintiffs.

Plaintiffs attempt to meet their burden on the first issue, in substantial part, with evidence regarding the NTA's leak of domestic audit information. The Court finds that alleged leaks of Japanese domestic audits, even of American companies, are irrelevant.[4]

---

[4] Plaintiffs argue the Court should consider NTA leaks of domestic tax information because Japan has the same obligation to keep domestic tax information confidential as it

- 8 -

1 Only evidence that the NTA routinely leaked information covered by the confidentiality
2 provisions of the U.S./Japan tax treaty prior to the October 1997 leaks can satisfy Plaintiffs'
3 burden.

4      Plaintiffs submitted 228 Statements of Fact and hundreds of pages of exhibits with
5 their Opposition to Defendant's Motion for Summary Judgment.  The Court will attempt to
6 succinctly summarize the evidence purporting to satisfy Plaintiffs' burden of proof with
7 regard to the IRS's foreknowledge of the NTA's allegedly routine leaks of tax treaty
8 information.  For ease of organization, the Court will address the evidence in the order and
9 manner presented in the Plaintiffs' Opposition.

10 Hedgpeth/Ng

11      Plaintiffs claim that immediately after the October 1997 media leaks, Competent
12 Authority ("CA") Official Hedgpeth stated that the NTA disclosures continue and that the
13 disclosures seem to happen on every large high profile case.  First, this is a statement found
14 in the notes of International Examination Manager Charles Mason of messages from CA
15 Hedgpeth, not a direct statement by Hedgpeth.  Second, the alleged statement does not
16 indicate that the so-called "high profile" cases were tax treaty cases.  And the Court has
17 found that only prior leaks of tax treaty information are relevant.

18      The email sent out by Hedgpeth on October 19, 1997 stating that the IRS was
19 suspending the exchange of information with Japan under the treaty because of the
20 complaints by Plaintiffs, "combined with past episodes of U.S. taxpayer information being
21 improperly disclosed in Japan" suffers from similar deficiencies.  The email does not provide
22 any details regarding the "past episodes."  Moreover, Hedgpeth testified at his deposition that
23 he meant past episodes of improper disclosure in Japan, "as reported by practitioners,"not

---

25 does to keep tax treaty information confidential.  This argument ignores the express language
26 of the September 20, 2000 Order that allowed Plaintiffs to survive a failure to state a claim challenge.  The Court found that the Plaintiffs would state a cause of action for disclosing
27 any information to the NTA only if they demonstrated the NTA "routinely failed to comply with the terms and conditions of secrecy *mandated by the Convention*." (emphasis added).
28

- 9 -

1  that the disclosures had actually occurred. Further, any actions the IRS took after the
2  October 1997 leaks to ensure the confidentiality of taxpayer information are not probative
3  of what the IRS knew before those leaks.

4  Plaintiffs also note that CA Lyons testified that Lyons thought Hedgpeth believed
5  NTA press leaks happened on every high-profile case. Again, Lyons does not state that the
6  high profile cases were cases conducted pursuant to the US/Japan tax treaty. And Lyons
7  goes on to testify that he did not agree that NTA leaks occurred on every profile case and
8  stated that no one could ever produce sufficient evidence of a NTA leak to him.

9  Plaintiffs again point to Mason's notes to attribute a quote to Frank Ng, the Revenue
10 Service Representative (RSR) for Tokyo. In his notes Mason writes the line "Does not
11 surprise Frank," and underneath that, "Any multi-national or important case seems to get
12 out." Assuming these notes accurately reflect what RSR Ng said, they still do not indicate
13 how the cases "get out", i.e., the notes do not state the NTA leaks every important case.

14 Ward/Tsujimoto

15 Both Assistant RSR Ward and RSR Tsujimoto testified that American taxpayers,
16 including members of the American Chamber of Commerce, often complained about the
17 NTA leaking Japanese domestic audit information. The Court notes that evidence regarding
18 complaints about and rumors of leaks is different from evidence of actual leaks. In any case,
19 this evidence is irrelevant because it involves the disclosure of Japanese domestic audits.

20 RSR Tsujimoto also testified about an alleged NTA leak that occurred at a Pacific
21 Area Tax Administrators (PATA) meeting in Australia in the early 1990s. RSR Tsujimoto
22 testified he recalled news articles in the international press about what the parties discussed
23 at the PATA meeting. The NTA had discussed things in a press conference that the other
24 parties did not appreciate. While this testimony does concern a leak by the NTA, it does not
25 concern a leak of information under the US/Japan tax treaty.

26 Johnson

27 CA Analyst Johnson testified that he knew of the disclosure of a transfer pricing
28 examination and an NTA proposed adjustment in Japan that both occurred prior to the

October 1997 leaks. But Johnson did not testify that the NTA was responsible for those disclosures.

Lyons

CA John Lyons testified that someone approached him in October 1995 and suggested the NTA might have leaked some confidential information. He said that press releases appeared in the Japanese media in October of 1997 and people made allegations similar to the allegations made by Plaintiffs here. It is unclear from Lyons's testimony, but the October 1995 press releases could have discussed treaty information. But Lyons testified that no one ever proved to him that the NTA was the source of the October 1995 leaks or any other leak.

Komamiya

Plaintiffs questioned Defendant's designated liability expert Fumihiro Komamiya about what he would consider a customary practice. In their Opposition, Plaintiffs claim that Komamiya opined that three or four leaks per year by the NTA would constitute a customary practice of leaking information. The Plaintiffs neglect to mention that when first asked if three to four leaks a year would be enough to constitute "customarily," Mr. Komamiya replied, "No, I would not feel that way." And that he testified three to four leaks a year would constitute a custom of leaking information only under certain limited circumstances.[5] Regardless, this testimony helps the Plaintiffs only if they can demonstrate the NTA improperly disclosed US/Japan tax treaty information three to four times a year - a burden they have not met.

---

[5] "Q: Okay. So if an employee of the Internal Revenue Service stationed at the embassy in Tokyo said that in his experience in the early 1990s, that situations which were alleged to be NTA leaks on American taxpayers or companies that were multinationals had occurred three to four times a year, would that be enough to constitute a customary practice? A: If in fact this is based on facts, if the three or four leaks are happening on a year-over-year basis, then perhaps it can be said that it is. But, however, if that's not based on the facts and in fact the leaks occurred from time to time, then you could not say that that was a customary practice." Komamiya Depo., Ex. 68, pp. 78-79, to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

Mr. Komamiya attached to his expert report twenty articles that included a direct attribution of confidential tax information to Japanese government sources. But the articles refer to governmental "sources" or "authorities," not specifically to the NTA. And Mr. Komamiya testified that those terms would apply to several entities. Only leaks by the NTA, not other Japanese government sources, support Plaintiffs' position.

Lowell

Cym Lowell, another defense expert, testified that in his personal experience and international tax law practice, he did not think the NTA made routine leaks of tax information. But he stated that this was just his point of view and that not everyone agreed with him.

Watanabe

Professor Takesato Watanabe, Plaintiffs' media expert, gave lots of opinions about the NTA's practices and disclosures. Professor Watanabe opined that the NTA conducts leaks on an almost daily basis. But he did not provide specific, *pertinent* examples. He testified that he personally knew of over ten cases where the NTA had leaked tax related information to the press, but did not say that the information was covered by the Japan/US tax treaty. The stories he describes at pages 100-101 of his deposition, cited by Plaintiffs, did not involve leaks of US/Japan tax treaty information.

Plaintiffs have cited to witness testimony of numerous rumors of leaks by the NTA of Japanese domestic audits. They have also highlighted testimony of complaints regarding the NTA's failure to maintain the confidentiality of taxpayer information. Further, they have attached stories attributing tax information to unnamed government sources.

But their Opposition lacks examples of other NTA leaks of US/Japan tax treaty information.[6] Without this evidence, Plaintiffs cannot create an issue of fact as to the IRS's

---

[6]CA Lyons did testify as to previous complaints by taxpayers in October 1995. Even if the NTA leaked information covered by the tax treaty in 1995, one example of a leak does not prove routine leaks.

knowledge of pre-October 1997 leaks of tax treaty information. Accordingly, Plaintiffs cannot survive summary judgment on Count II.

D.     <u>Standing of Yamagata Plaintiffs</u>

Because the Court finds the Plaintiffs cannot survive summary judgment on either Count of their Complaint, Defendant's standing arguments are moot. Accordingly,

IT IS HEREBY ORDERED GRANTING Defendant's Motion for Summary Judgment (Doc. # 485).

IT IS FURTHER ORDERED DENYING the Yamagata Plaintiffs' Motion for Partial Summary Judgment Regarding Liability (Doc. #480) and the Maughan Plaintiffs' Motion for Partial Summary Judgment (Doc. #482).

IT IS FURTHER ORDERED VACATING the Final Pretrial Conference set for July 9, 2007 and the bench trial set for July 31, 2007.

DATED this 2nd day of February, 2007.

_____
James A. Teilborg
United States District Judge