**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aloe Vera of America Inc., et al., | No. CV-99-01794-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Pending before the Court are Defendant's Motion to Exclude Plaintiffs' Expert Witness Watanabe from Trial (Doc. 630), Plaintiffs' Motion to Exclude Purported Expert Opinion of Toru Nakamura Regarding Damages and Causation (Doc. 635) and Plaintiffs' Motion to Exclude Purported Expert Opinion of Toru Nakamura Regarding the Media in Japan" (Doc. 636). The Court now rules on the motions.

**I.  Background**

The Court will not recount the saga of this case, which is adequately summarized in the Court's previous orders. *See Aloe Vera of Am., Inc. v. United States*, 730 F. Supp. 2d 1020, 1022-23 (D. Ariz. 2010); *see also* (Doc. 626 at 1-2). After fifteen years of litigation, trial is finally approaching. Both parties have moved to exclude certain expert testimony in this case pursuant to Federal Rule of Evidence ("FRE") 702. The opinions of two expert witnesses are at issue: Defendant's expert Dr. Toru Nakamura and Plaintiffs' expert Professor Takesato Watanabe.

**II.  Legal Standard**

FRE 702 governs the admissibility of expert opinion testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) the Supreme Court held that FRE 702 imposes an obligation upon trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. Thus, FRE 702 cloaks trial courts with the role of gatekeeper to determine, pursuant to FRE 104(a), whether expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 592. "It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

*Daubert*, which concerned the admission of expert testimony based upon scientific studies, enumerated several nonexclusive factors that a trial court may use to determine whether testimony based upon scientific knowledge is sufficiently reliable. These factors include whether the "theory or technique has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards controlling the technique's application," and whether the technique has been generally accepted in the relevant scientific community. 509 U.S. at 593-94. Nevertheless, the Supreme Court hinted that a trial court's gatekeeping obligation under FRE 702 extended to all forms of expert testimony, not just those concerning scientific knowledge. *See id.* at 590 n.8 ("Our discussion is limited to the scientific context because that is the nature of the expertise offered here."). It emphasized that the inquiry was "a flexible one" with "[i]ts overarching subject" as "the scientific validity and thus the

1   evidentiary relevance and reliability—of the principles that underlie a proposed
2   submission." *Id.* at 594-95.

3   In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court
4   clarified that a trial court's gatekeeping obligation indeed applies to all expert testimony,
5   even if, for example, that testimony is based upon experiential or other non-scientific
6   knowledge. 526 U.S. at 147. Although a trial court may find the factors enumerated in
7   *Daubert* to be "appropriate for use in determining the reliability of challenged expert
8   testimony" even for testimony based upon other than scientific knowledge, *id.* at 152, it is
9   not constrained to such questions. The trial court has "considerable leeway in deciding in
10  a particular case how to go about determining whether particular expert testimony is
11  reliable." *Id.* at 152. Thus, as stated in *Kumho Tire*, "where such testimony's factual
12  basis, data, principles, methods, or their application are called sufficiently into question . . .
13  . the trial judge must determine whether the testimony has 'a reliable basis in the
14  knowledge and experience of [the relevant] discipline.'" *Id.* (citations omitted) (quoting
15  *Daubert*, 509 U.S. at 592).

16  A trial court must do more than ensure that expert testimony is reliable, however;
17  it must also ensure that such testimony is relevant to an issue in the case. FRE 702
18  "requires a valid . . . connection to the pertinent inquiry as a precondition to
19  admissibility." *Daubert*, 509 U.S. at 591-92. As the rule states, the proposed testimony
20  must "help the trier of fact to understand the evidence or to determine a fact in issue."
21  Fed. R. Evid. 702. "Federal judges must . . . exclude proffered scientific evidence under
22  [FRE] 702 and 403 unless they are convinced that it speaks clearly and directly to an
23  issue in dispute in the case, and that it will not mislead the jury." *Daubert v. Merrell Dow*
24  *Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) [hereinafter *Daubert II*].

25  In the course of assessing the reliability and relevance of an expert's proposed
26  testimony, a trial court must be mindful that its role is that of "a gatekeeper, not a fact
27  finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v.*
28  *Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). "[T]he test under *Daubert* is not

the correctness of the expert's conclusion but the soundness of his methodology." *Daubert II*, 43 F.3d at 1318. "Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. Thus, as the Ninth Circuit Court of Appeals has remarked, "the gate [cannot] be closed to [a] relevant opinion offered with sufficient foundation by one qualified to give it." *Primiano*, 598 F.3d at 568.

**III.    Dr. Toru Nakamura**

Plaintiffs argue that the expert opinions of Dr. Toru Nakamura are not sufficiently reliable to satisfy FRE 702 because Dr. Nakamura did not use any economic analysis in reaching his opinion, did not "identify an economic methodology or analysis" in his report, and failed to calculate damages resulting from the assumed wrongful disclosure of Plaintiffs' tax return information. (Doc. 635 at 6). The Court disagrees.

**A.    Background**

Defendant retained Dr. Toru Nakamura as an expert witness to render an opinion concerning the causal link between any alleged wrongful disclosure of Plaintiffs' tax return information and damages Forever Living Products Japan ("FLPJ") suffered as a result of this disclosure. (Doc. 635-3 at 1). Dr. Nakamura has a PhD in economics and wrote his dissertation about Japanese industrial structure. (Doc. 635-4 at 10). He is a self-identified expert "in the Japanese bad economy." (*Id.*)

Dr. Nakamura has issued a report in which he opines that "it is not credible for the Plaintiffs to assume that the sharp decline of FLPJ's operating profit and sales in 1997-98 was caused by the alleged bad publicity in October 1997, and that FLPJ, but for that event, would have continued to realize the high 1992-96 average growth in sales and profit for the following 30 years." (Doc. 635-1 at 33). Dr. Nakamura believes that FLPJ's declining revenues in 1997-98 resulted from a consumption tax increase and a financial crisis in Japan. (*Id.*) He further asserts that due to Japanese macroeconomic forces, "FLPJ could not have realized the high growth in sales and profit it had attained in 1992-96." (*Id.*)

1 Dr. Nakamura's report contains at least six major sections relevant to Defendant's *Daubert* challenge. First, Dr. Nakamura discusses FLPJ's financial performance from 1992 to 2000. (Doc. 635-1 at 5-8). In this section, he reviews and comments on FLPJ's sales, operating profit, cost of sales, and ratio of raw material costs to net sales. (*Id.* at 6-7). Second, Dr. Nakamura summarizes FLPJ's business model, which includes importing aloe juice concentrates from Aloe Vera of America, Inc. and selling its products in Japan through a multi-level marketing system. (*Id.* at 8). Third, Dr. Nakamura explains, with reference to macroeconomic indicators including real GDP growth, consumer prices, unemployment rates, and the yen/dollar exchange rate, the struggles of the Japanese economy from 1997 to the present. (*Id.* at 10-16). He discusses the effect of a consumption tax increase in April 1997 and also presents data showing a number of Japanese companies had declining sales from 1997 to 1998. (*Id.* at 16-17).

Next, Dr. Nakamura discusses how multi-level marketing companies have fared in Japan in the pre-1997 versus post-1997 eras, including how legal changes have imposed additional regulations upon multi-level marketing companies. (*Id.* at 18-21). Dr. Nakamura then compares FLPJ to other multi-level marketing companies operating in Japan, summarizing their structure and historical sales. (*Id.* at 23-28). He also discusses operating profit and sales statistics for Japan's total wholesale and retail trade from 1997-2000, and presents statistics on the increasing quantities of aloe vera product imports into Japan from 1990-2005. (*Id.* at 28-32).

Dr. Nakamura concludes that FLPJ's decline in sales and operating profit coincided with a number of structural and macroeconomic changes to the Japanese economy. (*Id.* at 32-33). He opines that "[t]he ill-timed consumption tax increase and the emerging financial/banking crisis, instead, directly caused the FLPJ's problem in 1997-98." (*Id.* at 33). Dr. Nakamura believes that "as many historic forces shaping the 'Japan's Lost Decades' continue through the foreseeable future, FLPJ could not have realized the high growth in sales and profit it had attained in 1992-96." (*Id.*)

**B.     Analysis**

      **1.     Dr. Nakamura's Report**

Dr. Nakamura's opinion does not lack an economic methodology or analysis. Plaintiffs mistakenly assume that such analysis must be quantitative in nature. But Dr. Nakamura specializes in transfer pricing economics, which can involve qualitative assessments such as examining business models, market characteristics, and the like. *See* (Doc. 635-4 at 30; Doc. 635-1 at 34-35). Upon reading Dr. Nakamura's report, it is evident that Dr. Nakamura considered, qualitatively, those factors that one might expect to influence FLPJ's operating profits aside from the publicity surrounding its tax liabilities. Plaintiffs emphasize that Dr. Nakamura did not calculate any specific amount of damages as a result of FLPJ's bad publicity, did not perform a regression analysis, and did not perform a "but for" analysis to isolate the quantity of damages attributable to the bad publicity. (Doc. 635 at 6). But Dr. Nakamura was not required to do any of these things. His role in writing his report was to present possible alternative causes for FLPJ's decline in operating profits. *See* (Doc. 635-1 at 4) (". . . to examine alternative causes for the alleged damages . . .").

Dr. Nakamura's function in preparing his report is similar to that at issue in *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452 (D.N.J. 1999). There, the expert witness did not conduct his own economic analysis but rather reviewed other analyses as well as reviewed financial data that the offering party claimed "would otherwise be confusing to the jury." 73 F. Supp. 2d at 459. The court noted that "an experienced economist's clarification and summary of a large corporation's business plans could certainly prove helpful to the average juror who presumably lacks such experience in and knowledge about complex financial matters, even if doing so does not require employing any particular methodology but simply a straightforward review of the corporation's data." *Id.* at 461. The court concluded any shortcomings in the expert's testimony could be best addressed by cross-examination, not exclusion. *Id.* at 462.

Dr. Nakamura's report resembles the expert opinion at issue in *Voilas* because a

1  large portion of the report consists of summaries concerning the Japanese economy,
2  FLPJ's financial statistics, FLPJ's business profile, Japanese macroeconomic events, and
3  the like. Dr. Nakamura concludes from these facts that the adverse publicity was not the
4  sole cause of FLPJ's decline in profits. (Doc. 635-1 at 33). His conclusion is not based on
5  an econometric analysis, but instead from the common sense inference that if structural
6  and economic forces adversely impacted the Japanese economy, aloe vera consumption,
7  and multi-level marketing companies during the relevant timeframe, it is not appropriate
8  to conclude that a wrongful disclosure of tax return information was the sole cause of any
9  decline in FLPJ's profitability.

10  Plaintiffs point out that Dr. Nakamura has not "computed the actual impact of the
11  purported possibilities identified in his report." (Doc. 635 at 7). But Dr. Nakamura is not
12  required to quantitatively assess the impact upon damages for his underlying summary to
13  be reliable. Plaintiffs do not assert that Dr. Nakamura's opinion as to the condition of the
14  Japanese economy, for example, is based upon faulty data; their criticisms lie with Dr.
15  Nakamura's attempts to connect those events to Plaintiffs' alleged damages without a
16  data-driven analysis. These criticisms go to the weight of Dr. Nakamura's opinion, not its
17  admissibility. The Court agrees that Dr. Nakamura's inferences may be problematic, but
18  that is an issue to be exposed upon cross-examination and for the Court to consider when
19  weighing Dr. Nakamura's opinion. Dr. Nakamura's report explores the possibilities of
20  other factors influencing FLPJ's profit, but this exploration is not so unreliable as to
21  require exclusion.

22  Plaintiffs also argue that Dr. Nakamura's opinion contains inadmissible legal
23  conclusions. (*Id.* at 10). Expert witnesses cannot opine as to legal conclusions.
24  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).
25  Plaintiffs assert Dr. Nakamura provided a legal conclusion when he stated it was "not
26  credible for the Plaintiffs to assume that the sharp decline of FLPJ's operating profit and
27  sales in 1997-98 was caused by the alleged bad publicity in October 1997, and that FLPJ,
28  but for that event, would have continued to realize the high 1992-96 average growth in

- 7 -

1  sales and profit for the following 30 years." (Doc. 635-1 at 33). Plaintiffs ignore the
2  preceding language in Dr. Nakamura's report, which stated:

> My opinion concerning the Plaintiffs' complaint is as follows:
> Based on the ample empirical evidence, including those of the
> large MLMs comparable to FLPJ, it is not credible . . .

(*Id.*) The placement of Plaintiffs' selective quotation in its context makes clear that Dr. Nakamura was opining on the facts and not providing a legal conclusion as to credibility. Plaintiffs' argument fails.

      Plaintiffs further contend that Dr. Nakamura's opinion is not sufficiently related to the actual facts of this case to be either reliable or relevant. (Doc. 635 at 12). Plaintiffs complain that Dr. Nakamura improperly relied upon Plaintiffs' own damages disclosure asking for thirty years of damages when Plaintiffs have now decided that the damages period is only five years and eight months. (*Id.*) Defendant responds that at the time Dr. Nakamura issued his report, Plaintiffs had not narrowed their damages period. (Doc. 637 at 8). Regardless, this and Plaintiffs' other contentions are challenges appropriately reserved for cross-examination, not a *Daubert* challenge. None of Plaintiffs' arguments credibly attack the reliability or relevance of Dr. Nakamura's opinions. Plaintiffs point out that several of the factors Dr. Nakamura uses in his analysis appear to be irrelevant to the ultimate conclusion, including his references to the Japanese suicide rate and outbreaks of foodborne illness. *See* (Doc. 635-1 at 12, 21). But it is precisely because Dr. Nakamura explains and qualitatively assesses these factors that a trier of fact can satisfactorily evaluate whether they are likely to influence FLPJ's profits. Plaintiffs' objections go to weight, not admissibility.

      Finally, Plaintiffs assert that Dr. Nakamura developed his opinion for the purpose of furthering Defendant's position rather than as a result of his independent analysis. (Doc. 635 at 14). As evidence, Plaintiffs repeat that Dr. Nakamura failed to quantify a precise level of damages and did not perform "an economic analysis." (*Id.*) For the reasons already stated, the Court rejects these arguments.

      In sum, although Dr. Nakamura's report may contain serious shortcomings, his

- 8 -

1  opinion is not of the type that might, if admitted, mislead the trier of fact. Unlike an
2  econometric analysis where an expert witness may present opinion so outside the
3  knowledge of the trier of fact that the trier of fact must rely upon the expert's
4  methodology in evaluating that testimony, here Dr. Nakamura's testimony consists
5  largely of historical summary and proffered connections between certain events and
6  FLJP's decline in profits. The trier of fact (in this case, the Court) can adequately
7  determine whether it believes such connections exist and if so, to what extent, upon
8  presentation of the testimony at trial and subsequent cross-examination by Plaintiffs. At
9  that time, Dr. Nakamura's opinion may fail to persuade because of its lack of analytical
10 rigor. But at the admissibility stage, the Court cannot conclude that the report's
11 methodology is unreliable or irrelevant such that it should not be admitted.

### 2. Dr. Nakamura's Rebuttal Report

Dr. Nakamura authored a rebuttal report in response to Plaintiffs' disclosure of its expert witnesses Takesato Watanabe and Dr. Steven Schwartz. (Doc. 635-2 at 1). In his rebuttal, Dr. Nakamura criticizes a regression analysis that Dr. Schwartz performed to quantify Plaintiffs' economic damages. (*Id.* at 2). Plaintiffs argue that Dr. Nakamura is not qualified to opine on Dr. Schwartz's regression analysis because he has not performed such an analysis in this case; therefore, Plaintiffs claim, Dr. Nakamura's rebuttal opinion is unreliable and should be excluded. (Doc. 635 at 15).

Dr. Nakamura has never performed a "but for" analysis for a company in which he determined whether the occurrence of an event had an impact upon that company's financials, (Doc. 635-4 at 48), and has never performed a regression analysis involving t-statistics as an expert witness (although he has done so in academic papers), (*id.* at 34). Plaintiffs offer no evidence, however, that the statistical procedures involved in Dr. Nakamura's rebuttal are unreliable. The purpose of FRE 702 is not to ensure the soundness of the expert's testimony, but only the soundness of the underlying methodology. *See Daubert II*, 43 F.3d at 1318 ("[T]he test under *Daubert* is not the correctness of the expert's conclusion but the soundness of his methodology."). A "court

is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Plaintiffs' arguments attack the weight of Dr. Nakamura's rebuttal report, not its admissibility, and are appropriately directed to cross-examination during trial. Dr. Nakamura's rebuttal opinion with respect to Dr. Schwartz is admissible.

Separately, Plaintiffs attack the portion of Dr. Nakamura's rebuttal report that addresses Watanabe's opinions concerning Japanese media. (Doc. 636 at 1). Plaintiffs complain that Dr. Nakamura admits he is not an expert in Japanese mass media, yet has offered opinions as to Japanese media practices. (*Id.* at 5-6). Defendant admits Dr. Nakamura is not a mass media expert but claims that "Dr. Nakamura's comments about Mr. Wantanabe's [sic] report do not take issue with the latter's contentions regarding the Japanese media; they do take issue with his interpretation of statistical data and his conclusions about language." (Doc. 637 at 9).

Dr. Nakamura attempts in his rebuttal report to discredit Watanabe's opinions through citations to various historical sources, such as court rulings, public opinion polls, newspaper articles, and the like. (Doc. 635-2 at 7-13). Dr. Nakamura does so with the intent of controverting Watanabe's opinions concerning mass media in Japan. For example, Dr. Nakamura opines that Watanabe's analysis concerning the phraseology of the media reports publicizing FLPJ's alleged tax underreporting is flawed. *See* (*id.* at 7). Dr. Nakamura cites a Japanese-to-English dictionary as well as his own apparent knowledge to conclude that he disagrees with Watanabe's analysis. (*Id.* at 7-8). As another example, Dr. Nakamura opines that the "shortage of bylined articles in Japan . . . tends to obscure the reporter's responsibility." (*Id.* at 13-14).

Because Dr. Nakamura is opining to matters based on "scientific, technical, or other specialized knowledge," Fed. R. Evid. 701, his opinions regarding Watanabe's analysis are admissible only if Dr. Nakamura is qualified as an expert witness in the relevant field. The fact that both Defendant and Dr. Nakamura believe Dr. Nakamura to

not be an expert in mass media is not dispositive. *See Watson v. United States*, 485 F.3d 1100, 1105-06 (10th Cir. 2007) (upholding the trial court's ruling that a witness was an expert despite the witness's statements to the contrary). Nor does Dr. Nakamura's status as an expert in economics automatically translate into expert status in mass media. *See United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (trial court did not err in limiting expert's testimony to only those areas in which he was qualified as an expert).

Defendant has not established Dr. Nakamura as an expert in the field of mass media or Japanese mass media. Defendant claims that "Dr. Nakamura's training as an economist couple[d] with his experience in handling transfer pricing cases involving Japan and the United States give him insight into [areas concerning Japanese media and language]." (Doc. 637 at 9). If Defendant shows at trial that Dr. Nakamura is qualified as an expert to opine in response to Watanabe's opinions concerning Japanese media, Dr. Nakamura may give such testimony. The Court cannot so conclude on the present record, and therefore declines to rule at this time on the admissibility of Dr. Nakamura's testimony in rebuttal to Watanabe.

### 3. Alleged Bias

Finally, Plaintiffs attempt to convince the Court that the methodology underlying Dr. Nakamura's opinions is unreliable because Dr. Nakamura has previously worked for the Japanese National Tax Agency ("NTA"). (Doc. 635 at 16). Plaintiffs assert that Dr. Nakamura "continues to work on transfer pricing cases" for the NTA. (*Id.*) The evidence shows that Dr. Nakamura consulted once for the NTA in 1998 and in 2003 provided services for a person who worked for the NTA. (Doc. 635-4 at 51-52). There is no evidence of an ongoing relationship between Dr. Nakamura and the NTA.[1] There is no evidence of Dr. Nakamura's bias in favor of NTA, much less that this bias renders his opinions unreliable.

---

[1] As Defendant points out, under Plaintiffs' fanciful idea of bias, Plaintiffs' counsel would be biased against Plaintiffs in this case because of their former employment by the IRS. *See* (Doc. 637 at 9).

- 11 -

**IV.     Takesato Watanabe**

With respect to expert witness Professor Takesato Watanabe, Defendant argues that his expert opinions are not sufficiently reliable to be admissible under FRE 702 because there is no reliable methodology underpinning his conclusions regarding Japanese news media. (Doc. 630 at 2).

**A.     Background**

**1.     Qualifications**

Professor Watanabe is a professor of media and communication ethics at Doshisha University in Japan. (Doc. 630-2 [hereinafter "Report"] at 1). He has earned bachelor's and master's degrees in international communications and journalism and has taught classes at Japanese universities since 1969 in the areas of mass communication theory and journalism. (Tr. at 13-14, 17).[2] Professor Watanabe's academic research focuses on topics in journalism such as freedom of speech and the roles of journalism (*Id.* at 18). He has published twenty-five books on the topic of media and journalism, and also written over 300 articles for Japanese newspapers on the subject of media. (*Id.*) Professor Watanabe has been published in almost every national newspaper in Japan, and has written newspaper articles for forty years. (*Id.* at 18-19). Professor Watanabe regularly collaborates with journalists when writing his articles. (*Id.* at 20).

Professor Watanabe also serves as counsel or advisor to Japanese news media organizations, including a television station in the Kansai region and for the newspaper company Kyoto Shimbun. (*Id.* at 20-21). Professor Watanabe chairs both advisory committees, where as part of his work he provides guidance on the quality of reporting. (*Id.* at 21). He has never been a member of a press club in Japan, but has relationships with a number of journalists who are press club members and is familiar with the operation of press clubs. (*Id.* at 21-22).

---

[2] Citations to the transcript are to the transcript of the *Daubert* hearing held on June 25, 2014.

### 2. Japanese Media

As Professor Watanabe explains, Japanese press clubs are voluntary organizations for gathering and reporting news on public organizations. (Report at 6). The Japanese media has historically used press clubs to demand the disclosure of information from public organizations. (*Id.* at 6-7). According to Professor Watanabe, information exchanges between Japanese government organizations and press clubs occur according to one of five patterns. First, there may be official announcements at a press conference. (*Id.* at 7). Second, the government may choose to release the news in a certain way through particular news reporters; this is a form of "leak" from the government. (*Id.* at 7-8). Third, a reporter may conduct investigative reporting and obtain confirmation from the government source before reporting. (*Id.* at 8). Fourth, a reporter may obtain undisclosed information and use it not to report to the public but for "his own advantage or for the advantage of his newspaper company." (*Id.* at 8). Fifth, the government or someone in a close relationship with the government may provide information to a news reporter (e.g. whistleblowing). (*Id.* at 8).

Professor Watanabe opines in his report that there are two principal ways in which the Japanese media references governmental sources who have leaked information to the media. (*Id.* at 13). First, when the information is disclosed at a press conference or in a semiformal manner, the media and the government have settled upon phrases such as "According to a high ranking officer of the Ministry of Foreign Affairs . . ." as a means of classifying the source as certain of the high ranking officers in the governmental body but not identifying a specific person. (*Id.* at 13-14). Second, and relevant to this case, when the media is reporting on leaked information, it uses terms such as "kankeisha ni yoruto . . ." and "kankeisha ni yoreba . . ." (literally, "According to person(s) who were involved . . ."). (*Id.* at 14). Other terms used are "dearu koto ga wakatta" ("It was revealed that . . ."), "moyo da" ("It appears that . . ."), and "gaakiraka ni natta" ("It became clear. . ."). These code words are used when the leak is illegal or the informant would suffer personal harm if revealed to be the source of the leak. (*Id.*) According to

Professor Watanabe, "kankeisha" refers to a "party that is in a position to have direct knowledge as to the topic being reported on." (*Id.*)

### 3. The Aloe Vera Leak

Professor Watanabe opines that the source of the news reports in the Japanese media concerning FLPJ's underpayment of taxes was a government official with the NTA. (*Id.* at 15). He bases his opinion upon his experience with the Japanese media, and particularly upon the use in the news reports of certain code words, including "kankeisha," in conjunction with other facts concerning the timing and format of the reports.

Professor Watanabe begins his analysis with the text of the news reports themselves. He notes that the term "kankeisha" appears in the news reports of the NHK, Kyodo, Yomiuri, Asahi, Sankei, Nihon Keizai, and Tokyo newspapers. (*Id.* at 14). Because "kankeisha" refers to a party having direct knowledge of the matter reported, Watanabe initially determines that the source must be FLPJ, Aloe Vera of America, an NTA official, or the IRS. (*Id.*) The NHK television news report used the phrases "kankeisha ni yorimasu to" ("According to a person who was involved . . .") in close proximity to ". . . shite ita toiu koto desu") ("it was said that . . . they had been doing"). Professor Watanabe states that this latter expression has the same meaning as ". . . toiu koto ga wakatta" ("It has been revealed that . . ."). (*Id.* at 17). He concludes that in the "context of a tax news report, both expressions are used to conceal a Japanese government information source." (*Id.*)

Professor Watanabe also analyzes a Kyodo News report that uses the phrases ". . . gawakatta" and "kankeisha ni yoruto." (*Id.* at 19). He discusses how these phrases are contextually equivalent to those in the NHK report and how this signifies "that either Kyodo or NHK obtained the same information from the same government information source in advance, or that Kyodo 'confirmed' the details of the Aloe Vera Case directly with Japanese tax officials after seeing the NHK news broadcast." (*Id.*) Professor Watanabe further concludes, based upon his experience and knowledge with the

- 14 -

1   unwritten codes of the Japanese media, that the relative timing of the various news
2   reports shows that NHK was the first to receive the leaked information.[3] (*Id.* at 20).

3   Because NHK was the first to report on FLPJ's alleged underpayment, Professor
4   Watanabe opines that either NHK obtained the information through a leak or NHK
5   obtained "related information" on its own and then confirmed the information with the
6   NTA before publishing its report. (*Id.* at 21). He opines that this news was then sent to
7   other members of the NTA press club, who subsequently reported it the following day.
8   (*Id.* at 22).

9   Having opined that the NTA leaked the information concerning FLPJ's
10  underpayment to NHK, Professor Watanabe then discusses several facts which he asserts
11  provide further support for his conclusion. *See* (*id.* at 23). First, he points out that the
12  NHK report identified this case as the "second highest income concealment case" ever
13  exposed, a fact that he considers to be "too particular and specialized" to have originated
14  with anyone other than the NTA. (*Id.* at 23). Second, he points to an English translation
15  by the Kyodo news agency that reported "Tax sources said . . ." and concludes that the
16  translator either (1) assumed based on common knowledge that "kankeisha" meant tax
17  authorities or (2) conferred with the original reporter to confirm the source of the leak
18  before choosing that expression. (*Id.* at 23-24). Third, he categorizes NHK's reporting as
19  a "scoop" where NHK was the first to confirm leaked information and to report the news.
20  (*Id.* at 24).

21  Fourth, Professor Watanabe opines that because subsequent news reports by
22  agencies other than NHK contained additional information not found in NHK's initial
23  report, either NTA wanted only NHK to report the news or an NHK reporter was able to
24  independently develop and then confirm with NTA the news story. (*Id.* at 24). Fifth, he
25  estimates from the timing of the NHK television broadcast and the newspaper articles
26  that if NHK was the initial recipient of the scoop, there was no time for the newspapers to

---

28  [3] Professor Watanabe also concludes that various other newspaper reports are consistent with the NTA as the source of the leak. (Report at 20-22).

1 verify the accuracy of the information. Therefore, he concludes the source must have
2 been highly trusted, i.e., a government official. (*Id.* at 25-26). Sixth, Professor Watanabe
3 opines that a mutual interest exists between NTA officials and reporters to perform favors
4 for one another. (*Id.* at 26-27). Finally, Professor Watanabe points to, as evidence the
5 NTA leaked the information at issue, a 2006 magazine article discussing the FLPJ leak
6 and the problem of NTA leaks for simultaneous examinations in general. (*Id.* at 27).

### B.     Analysis

Defendant asserts that Professor Watanabe's opinion cannot meet the *Daubert* standards for admissibility under FRE 702 because it is based not on sound methodology but upon "speculation disguised as expert opinion." (Doc. 630 at 12). Defendant attempts to shoehorn Professor Watanabe's experiential knowledge into *Daubert*'s framework for assessing expert opinions based upon *scientific* knowledge. As the Supreme Court stated in *Kumho Tire*, the factors enumerated in *Daubert* are "helpful, not definitive." 526 U.S. at 151. But the *Daubert* court also recognized that "some of *Daubert*'s questions can help to evaluate the reliability of even experience-based testimony. In certain cases, it will be appropriate for the trial judge to ask . . . how often an . . . experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant . . . community." *Id.*

Defendant's chief argument is that no scientific, academic, "or other source . . . supports [Watanabe's] opinion or methodology." (Doc. 630 at 12). Defendant correctly points out that aside from Professor Watanabe's testimony, Plaintiffs have offered no evidence that the inferences he draws from his experience are correct and the methodology applied based on that experience is reliable. Indeed, aside from Watanabe's report and testimony at the *Daubert* hearing, there is no evidence of the use by the Japanese media of certain words and phrases to convey nonliteral meanings.

Nevertheless, Professor Watanabe testified that he formed his opinion based upon his past research and experience regarding Japanese journalism. (Tr. at 28, 30). Defendant could have countered Professor Watanabe's testimony by offering a witness

similarly familiar with Japanese journalism who could testify that based on his or her experience, it is not possible to reliably conclude the source of an information leak based on the word "kankeisha" in a news article. Defendant offered no such evidence, however, choosing only to cross-examine Professor Watanabe in an attempt to force him to acknowledge limitations in this methodology. Professor Watanabe admitted that it was "theoretically" possible for "kankeisha" to refer to a source other than the Japanese authorities, but that as a matter of course the word in this particular context had to mean the NTA. (Tr. at 39, 40, 42-44). Much of the exchange on cross-examination between Defendant and Professor Watanabe involved Defendant attempting to restrict the meaning of "kankeisha" to the literal dictionary definition while Professor Watanabe insisted that although "kankeisha" had a dictionary definition, it was well-understood that in the context of Japanese news articles involving tax issues, it meant the NTA. (Tr. at 44-47).

Professor Watanabe's methodology is similar to that of code word analysis, an experience-based discipline in which law enforcement officers familiar with words and phrases commonly used in the drug trade testify as to the meanings of particular words used by defendants charged with drug crimes. *See, e.g.*, *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). The Fourth Circuit Court of Appeals has noted that "[e]xperiential expert testimony . . . does not rely on anything like a scientific method." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (citation and internal quotation marks omitted). The advisory committee notes to FRE 702 contemplate the admission of testimony based upon code word analysis:

> For example, when a law enforcement agent testified regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed. R. Evid. 702 advisory committee notes to 2000 amendments. Here, Professor

1   Watanabe testified that the Japanese media regularly uses code words to conceal the
2   identity of its sources while still informing the readers that the source is a government
3   official. (Tr. at 30-32). Professor Watanabe's method is his extensive experience in
4   Japanese journalism and study of Japanese media, and he used his experience to analyze
5   the meaning of the words, including "kankeisha," found in the relevant news articles
6   concerning FLPJ.

7   Therefore, although Defendant attacks Professor Watanabe's method as not having
8   been "subject to peer review and publication" and not "generally accepted in his
9   community of peers," (Doc. 630 at 13), these criticisms are unfounded insofar as the
10  basis for Watanabe's opinion is experience, not scientific analysis. Defendant also asserts
11  that Watanabe's assumption that unidentified sources must be government sources solely
12  because the subject of an article is tax information is flawed such that Watanabe's
13  methods are unreliable. (*Id.* at 13-14). But Defendant neglects that according to
14  Watanabe, this assumption is based upon his experience with the practice of journalism in
15  Japan. (Tr. 31). Defendant cannot assume one component of Watanabe's testimony to be
16  false and then rely upon that logic to conclude that his testimony must be unreliable.

17  The Court finds Professor Watanabe's testimony and report sufficient to satisfy
18  *Daubert* and FRE 702. However, although Defendant does not succeed today in
19  excluding Professor Watanabe's opinion, the Court has some concerns regarding its
20  reliability. The Court's decision relies heavily upon two factors peculiar to this case.
21  First, concerns regarding unreliable evidence are lessened when the Court sits as the trier
22  of fact. *See CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233
23  (E.D. Cal. 2005). "Most of the safeguards provided for in *Daubert* are not as essential in
24  a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs*
25  *v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). Therefore, to the extent the Court has
26  remaining doubts concerning the reliability of Professor Watanabe's methodology, these
27  doubts may be addressed at trial when the Court will weigh his opinion evidence.[4]

28

---

[4] Defendant asserts that to the extent Professor Watanabe's opinion is based upon

- 18 -

Second, Defendants offered *no* evidence contradicting Professor Watanabe's testimony; thus, even giving this testimony minimal weight, the balance of the evidence tips in favor of Plaintiffs on the issue of admissibility. As the purpose of a *Daubert* hearing is to assess the validity of an expert's methodology, Plaintiffs could have offered a witness familiar with the Japanese media who could testify that based on his experience, "kankeisha" did not reliably mean the unidentified source in a tax news report was an NTA official. Even ascribing slight weight to such evidence may have been sufficient to overcome Professor Watanabe's testimony. But Defendant failed to present such evidence.

## V. Conclusion

For the foregoing reasons,

**IT IS ORDERED** denying Defendant's Motion to Exclude Plaintiffs' Expert Witness Watanabe from Trial (Doc. 630).

**IT IS FURTHER ORDERED** denying Plaintiffs' Motion to Exclude Purported Expert Opinion of Toru Nakamura Regarding Damages and Causation (Doc. 635).

**IT IS FURTHER ORDERED** denying Plaintiffs' Motion to Exclude Purported Expert Opinion of Toru Nakamura Regarding the Media in Japan (Doc. 636).

Dated this 7th day of July, 2014.

_____
James A. Teilborg
Senior United States District Judge

---

inadmissible evidence, Plaintiffs failed to satisfy FRE 703's requirement that the facts or data be of a type that an expert "in the particular field would reasonably rely on." Fed. R. Evid. 703; (Doc. 630 at 12 n.4). But it seems that an expert in Japanese media would reasonably rely upon the contents of news reports and discussions with journalists in opining on topics relating to Japanese media, and thus Professor Watanabe's opinion is admissible under FRE 703. To the extent this issue remains, it may be explored at trial.