1   **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9   Aloe Vera of America Incorporated, et al.,        No. CV-99-01794-PHX-JAT

10                  Plaintiffs,                        **FINDINGS OF FACT AND**
                                                       **CONCLUSIONS OF LAW**
11   v.

12   United States of America,

13                  Defendant.

14

15          The United States and Japan are parties to a tax treaty that permits the Internal

16   Revenue Service ("IRS") to disclose to Japan, for purposes of preventing international

17   tax evasion, the tax return information of an American taxpayer.[1] The treaty does not

18   authorize, however, the disclosure of tax return information known to be false, and the

19   United States has waived sovereign immunity from liability for its unauthorized

20   disclosure of tax return information. The issue presented is whether and to what extent

21   the United States is liable for allegedly making knowingly false statements to Japanese

22   tax authorities during a joint investigation of Plaintiffs' tax returns.

23          The first alleged false statement of the United States is an assertion that Plaintiffs

24   had unreported income properly taxable by the United States. The second alleged false

25   statement is that transfer prices between Plaintiffs' Japanese and American entities did

26   not correlate over time with certain commissions paid by one Plaintiff to two other

27

28          [1] Convention for the Avoidance of Double Taxation and Prevention of Fiscal
     Evasion with Respect to Taxes on Income, U.S.-Japan, Mar. 8, 1971, 23 U.S.T. 967.

1   Plaintiffs. For the reasons that follow, the Court concludes the United States made the
2   first statement while knowing it to be false, but did not know the second statement to be
3   false at the time of its utterance. Because Plaintiffs cannot show the false statement
4   caused actual damages, the Court awards statutory damages of $1,000 to each of three
5   Plaintiffs.

6   **I.      Procedural History**

7          Plaintiffs Aloe Vera of America, Incorporated; Rex G. Maughan; Ruth G.
8   Maughan; Maughan Holdings, Incorporated; Gene Yamagata; and Yamagata Holdings,
9   Incorporated (collectively, "Plaintiffs") sued the United States for unauthorized
10  disclosure of tax return information under 26 U.S.C. § 7431(a)(1) after the Japanese
11  media reported that a company owned by Plaintiffs, Forever Living Products Japan, Ltd.,
12  had committed tax evasion.

13         The operative complaint is Plaintiffs' Third Amended Complaint (Doc. 405), in
14  which Plaintiffs alleged two counts against the United States: In Count I, Plaintiffs
15  alleged the United States disclosed false tax return information concerning Plaintiffs to
16  the Japanese tax authorities and the United States knew or should have known that this
17  information was false. (Doc. 405 at 14). In Count II, Plaintiffs alleged the United States
18  knew or should have known at the time of disclosing Plaintiffs' tax return information to
19  the Japanese tax authorities that those authorities routinely did not keep such information
20  confidential within the terms of the tax treaty. (*Id.* at 16-17).

21         Although the United States was unsuccessful in having this case dismissed on the
22  issue of subject-matter jurisdiction, *see* (Doc. 65), the Court ultimately granted summary
23  judgment in the United States' favor, concluding that Plaintiffs had failed to establish the
24  existence of a genuine issue of material fact on either Count I or Count II of the Third
25  Amended Complaint. *Aloe Vera of Am., Inc. v. United States*, 2007 WL 329111, at *5, 8
26  (D. Ariz. Feb. 2, 2007). On appeal, the Ninth Circuit Court of Appeals ("Court of
27  Appeals") remanded for a determination of subject-matter jurisdiction based upon the
28  statute of limitations. *Aloe Vera of Am., Inc. v. United States*, 580 F.3d 867, 873 (9th Cir.

2009). The Court found it had jurisdiction over some claims, but reaffirmed its judgment in favor of the United States for the reasons stated in its previous summary judgment ruling. *Aloe Vera of Am., Inc. v. United States*, 730 F. Supp. 2d 1020, 1035-36 (D. Ariz. Aug. 3, 2010).

On a second appeal, this time concerning the merits of the summary judgment ruling, the Court of Appeals affirmed in part and reversed in part, holding that genuine issues of material fact existed on Count I of Plaintiff's Third Amended Complaint. *Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1166 (9th Cir. 2012). Following remand, the United States moved for partial summary judgment, which the Court denied. *Aloe Vera of Am., Inc. v. United States*, 2013 WL 6836603 (D. Ariz. Dec. 17, 2013). The Court held a bench trial and the parties submitted post-trial briefs on all issues. (Docs. 695, 696, 700, 701).

Having considered the bench trial, closing arguments, and post-trial briefing, the Court finds and concludes as follows:

## II.     Findings of Fact

### A.     Background

#### 1.     Forever Living Products & Aloe Vera of America, Inc.

Plaintiffs are involved in the international supply of aloe vera-based health and beauty products. Plaintiff Rex G. Maughan is the founder of Forever Living Products, a company that sells aloe vera products through multi-level marketing. Rex Maughan owns and operates a number of related entities, including entities that are Plaintiffs in this case, (collectively, the "FLP Group") that manufacture, process, market, and sell these aloe vera-based products. The FLP Group is vertically integrated from the growing of aloe vera plants through the marketing and sales of the finished health and beauty products. FLP Group products are ultimately distributed worldwide through several million independent distributors.

Plaintiff Aloe Vera of America, Incorporated ("AVA") is an S corporation

incorporated in Texas and is wholly owned by Plaintiff Rex G. Maughan.[2] AVA is a manufacturing company that processes raw aloe vera gel to create a stabilized product with a shelf life that is then sold to other FLP Group entities for multi-level marketing.

### 2.   FLPJ

Forever Living Products Japan ("FLPJ") was founded in 1980 and is the FLP Group entity responsible for the distribution and marketing of aloe vera products in Japan. During the years relevant to this litigation, 1991 to 2005, Plaintiff Maughan Holdings, Inc. ("MHI") owned 50% of FLPJ and Plaintiff Yamagata Holdings, Inc. ("YHI") owned 50% of FLPJ. MHI is an S corporation incorporated in Arizona and is wholly owned by Plaintiff Rex G. Maughan. YHI is an S corporation incorporated in Nevada and is wholly owned by Plaintiff Gene Yamagata. MHI and YHI are both holding companies for their respective owners.

FLPJ sells its products in Japan through multi-level marketing. Multi-level marketing involves the use of distributors, who are independent contractors that purchase product from FLPJ and sell it to consumers. Distributors earn income in two ways: First, distributors directly sell FLPJ products to consumers at a price that is higher than the distributors' wholesale cost of purchase. Second, each distributor earns a percentage of the sales of other distributors whom that distributor has recruited into the FLPJ marketing program.

Rex Maughan and Gene Yamagata were the original distributors for FLPJ as well as company officers and directors. Thus, they earned income from FLPJ in three ways: as distributors (earning a percentage of the sales of "down line" distributors), as compensation for services rendered as directors and officers, and in the form of dividends through their ownership interests.

---

[2] It is unclear whether those entities owned by Rex G. Maughan are owned solely by him, *see* (Doc. 669 at 5-6), or are owned by Rex G. Maughan and his wife, Plaintiff Ruth G. Maughan, *see* (Tr. 46). This distinction is not at issue in the case and the Court makes no findings on this point. References to "Maughan" to refer to Rex Maughan unless otherwise specified.

### 3.     The Royalty Agreement Between FLPJ and AVA

AVA generally sells processed aloe vera products to the FLP Group entity responsible for marketing and sales in each country. However, Japan requires that a portion of the manufacturing process occur within its borders. Thus, AVA sells bulk raw aloe vera gel, rather than processed product, to FLPJ. A third party in Japan performs AVA's proprietary stabilization and bottling processes, and FLPJ then distributes the processed products in Japan. FLPJ has been selling AVA's product since the beginning of FLPJ's sales in 1983.[3]

AVA has been the exclusive supplier of FLPJ's aloe vera products since 1990 when the parties entered into a sales agreement. In the 1990 agreement, FLPJ agreed to purchase its raw aloe vera product exclusively from AVA. FLPJ also agreed to pay a royalty of 3.5% of its sales to AVA in exchange for the use of AVA's technology to process the raw aloe vera gel. During 1991-2005, about 40% of AVA's total sales were to FLPJ under this agreement.

### 4.     Raw Aloe Vera Gel Prices and Commissions/Royalties from FLPJ to Maughan and Yamagata

The price for raw aloe vera gel between AVA and FLPJ varied over the years. From 1988 through February 1992, the price was $18 per gallon. From March 1992 through the end of 1995, the price was $20.90 per gallon. During the period from 1988 through 1995, AVA's accounting included in its cost of goods sold to FLPJ a commission/royalty per gallon of aloe vera gel sold. The commission rate was $8.10 per gallon from 1988 through February 1992, and $11 per gallon from March 1992 through the end of 1995. AVA did not retain this commission but paid it directly or indirectly to Maughan and Yamagata in equal shares. AVA deducted this commission from its gross income as an ordinary and necessary business expense.

---

[3] FLPJ was incorporated in 1980 but spent three years obtaining the necessary product and marketing plan approval before it commenced sales.

5.      **Plaintiffs' Prior Audits**

Plaintiffs were the subject of at least two prior audits before the audits and examinations at issue in this case. First, in 1985, the National Tax Administration of Japan ("NTA"), the agency responsible for the enforcement of Japan's tax laws, audited FLPJ with respect to the deductibility of compensation paid to FLPJ directors. Second, the IRS audited AVA and the Maughans for the 1987-90 tax years. In the process of examining the Maughans' tax returns for the 1988-90 tax years, the IRS determined that FLPJ had been paying royalties for the benefit of Maughan and Yamagata to an entity named "Batrax" for the purpose of deferring tax liability.[4] Additionally, an International Examiner's Report prepared for the 1988-90 tax years recommended disallowing deductions taken by AVA for commissions paid by FLPJ to AVA and passed through to Maughan and Yamagata.

B.      **The IRS-NTA Simultaneous Examination**

1.      **The Development of the Simultaneous Examination Proposal**

In May 1995, the IRS assigned Rick Smith, an international examiner, to examine the international issues for the tax returns of Rex and Ruth Maughan. Smith's examination also included the tax returns of Forever Living Products and AVA. This audit was for the 1991 and 1992 tax years and concerned payments made by FLPJ to AVA. Smith produced an International Examiner's Report in which he recommended disallowing AVA's deductions for the commissions paid by FLPJ to AVA and passed through to Maughan and Yamagata; Smith recommended disallowing these deductions (thus increasing AVA's taxable income) to the extent of $9,681,688 for the 1991 tax year and $23,668,075 for the 1992 tax year.

Sometime between May 1995 and January 1996, Charles Mason, Smith's manager and the manager of the IRS's international group for the region including Arizona, assigned Smith to draft a proposal to Japan that the IRS and NTA jointly and simultaneously examine the tax returns of the Maughans and their related entities

---

[4] Section II.B.1, *infra*, contains a more detailed explanation of Batrax.

(including FLPJ and AVA) (the "Simultaneous Examination Proposal" or "SEP"). As the primary author of the SEP and the international examiner assigned to the audits of the Maughans, Smith's goal for the proposed simultaneous examination was to discover whether the taxpayers had any additional sources of income, unknown to the IRS, that the taxpayers were funneling through an operation similar to Batrax to defer tax liability.

Smith was aware of the examinations for the 1988-90 tax years in which the IRS discovered that FLPJ paid royalties to Batrax, a foreign entity, that were otherwise for the benefit of Maughan and Yamagata. Instead of Maughan and Yamagata paying U.S. income taxes on these royalties, Batrax held the royalties in foreign trusts for their benefit. The effect was to defer any taxation on this income until Maughan and Yamagata chose to bring the money into the United States.[5]

Smith had also encountered Batrax when he read documents from a 1990 lawsuit between Maughan and Yamagata in which Yamagata alleged that Maughan used Batrax as a scheme to evade reporting and paying U.S. income taxes. As part of his research, Smith read a transcript from that lawsuit in which the structure of Batrax was explained in detail, including the use of foreign entities and trusts to defer U.S. taxes. By the time Smith drafted the SEP, however, he knew that Yamagata and Maughan had reported all of their royalty income for the 1991 and 1992 tax years.

The IRS's past examinations had revealed that there were other entities possibly using Batrax as well. Smith had also conducted Internet research and read an article suggesting that an aloe vera farm in the Philippines was related to the FLP Group. Smith wanted to use the simultaneous examination to discover whether there were other aloe vera farms outside of the United States that were unknown to the IRS and whether income from any such farms was being structured through Batrax or an equivalent, although he also believed that such unreported income might not exist.

Before Smith drafted the SEP, he reviewed the procedures in the Internal Revenue

---

[5] Yamagata had always reported this income on his U.S. tax return; Maughan did so after 1990 when he "brought in" all his deferred income. FLPJ's use of Batrax ended in 1990.

Manual ("IRM") for simultaneous examinations. Smith generally followed the format specified in the IRM for drafting a SEP. Part III of the SEP in both its final and draft forms was titled "Estimated or Potential Additional Tax from Issues in Part II." The purpose of this section was to estimate the additional tax that could be assessed against the taxpayers following the simultaneous examination on the topics listed in Part II. The IRM provided as follows:

> Part III of the format . . . endeavors to present the potential benefits a Simultaneous Examination of a proposed case would yield. In many cases, examinations may not have progressed to a point where specific amounts, either of tax or of adjustments to income, can be estimated. In such cases, it should be plainly stated that no estimate can be made at this stage of the examination. If an estimate is given, a brief description of how the estimate was arrived at should be provided.

Smith's early drafts of the SEP did not include any numbers whatsoever in Part III, including any numbers expressing an amount of estimated additional tax that could be assessed as the result of a simultaneous examination. Smith listed all amounts in Part III as unknown because at the time he believed the IRS's examination had not progressed to the point where a specific amount could be estimated; Smith did not know the extent or even the existence of any unreported income.

When Smith submitted his draft SEP to Mason, however, Mason instructed Smith that there had to be numbers in Part III. Smith responded to Mason that he could not "really put numbers in there" and any estimates "would not be very good" because Smith was looking for income that was not definitely known to exist, and accordingly Smith had no basis for computing any such amount. Mason repeated to Smith that Smith had to put numbers in the SEP, but the numbers had to be justified. Smith then asked Sally Warner, the competent authority representative in the simultaneous examination program, whether there had to be numbers in Part III. Warner—whom Smith believed to be an expert on simultaneous examination procedures—told Smith that there had to be numbers. Smith argued with Mason and Warner that the amounts should be listed as unknown; Warner told Smith that nobody ever pays attention to the amounts in a

simultaneous examination and although they were important to convey an idea, they were not a critically important part of the SEP.[6]

Subsequently, Smith used the sales of aloe vera gel to make an "estimate of potential" for unreported income, which he listed in Part III of the SEP. He intended this estimate (approximately $32 million) to show potential adjustments to the taxpayers' income from "unknown activities" including unreported income. Smith does not remember the details of how he created this estimate, but he intended it to include the possible aloe vera farm in the Philippines and any unknown entities similar to Batrax.[7] Smith believed these unknown entities could create a potential for the approximately $32 million of unreported income in his estimate. The estimate was not based on Smith's actual calculations of royalty/commission income paid to Maughan and Yamagata in 1991 and 1992 contained in his International Examiner's Report, however.

The final draft of the SEP reflects the addition of Smith's estimate (comprising eight separate figures) and explanation for that estimate as follows:

Part III

1. Estimated or Potential Additional Tax from Issues in Part II:

Amounts are estimates based on sales of aloe vera gel to FLPJ during 1991 and 1992:

| For Internal Revenue Service: | 1991 | 1992 |
|---|---|---|
| Unreported income of | $10,616,000 | $21,500,000 |
| | | |
| For Japan: | | |
| Disallow royalty expense of | $3,698,000 | $7,000,000 |
| Disallow commission expense of | $6,918,000 | $14,500,000 |

---

[6] Warner did not believe that Part III was "necessarily" an important part of a simultaneous examination proposal.

[7] Smith did not intend to create a large estimate merely to entice the NTA into accepting the SEP and entering into a simultaneous examination.

| | | |
|---|---|---|
| Withholding tax on dividends | $1,592,000 | $3,225,000 |

2. <u>Other Potential Benefits to the IRS and Japan</u>:

Another potential benefit for both treaty partners is an increased knowledge of how entities are using tax haven schemes to avoid taxes in both countries. It will also give us a better understanding of how entities are manipulating cost of goods sold to avoid taxation.

3. <u>Other Considerations Not Mentioned Elsewhere</u>:

We believe Mr. Maughan and Mr. Yamagata are telling us one thing and telling the Japanese tax authorities something completely different.

Although Part III.3 of the SEP accused Yamagata and Maughan of wrongdoing by making inconsistent representations to the U.S. and Japan, Smith knew of no actual unreported income at the time he drafted this section, he believed the amount "couldn't be quantified," and his explanation that the estimate was based upon the sales of aloe vera gel was inaccurate. After Smith added his estimate to Part III of the draft SEP along with his explanation that the figures were based on sales of aloe vera gel to FLPJ during 1991 and 1992, Mason approved the draft SEP.

Smith sent the final draft of the SEP to the IRS's national office for transmittal to Japan. At the time Smith sent the final draft to the national office, he believed his $32 million was a potential estimate of unreported income but did not believe that Maughan and Yamagata actually had $32 million of unreported income.

**2.      The IRS Sends the SEP to Japan**

On April 26, 1996, the IRS, through Frank Ng acting on behalf of United States Competent Authority John T. Lyons,[8] sent a letter to Keiji Aoyama, Director of the Office of International Operations for the NTA proposing that the NTA and IRS jointly

---

[8] The United States Competent Authority is a source of authority pertaining to income tax treaties. "Income tax treaties generally permit taxpayers to request assistance from a designated 'competent authority' if they believe that any party to the treaty has taken action that has resulted or will result in taxation that is contrary to the provisions of the treaty." *Aloe Vera*, 699 F.3d at 1158.

1    examine Rex and Ruth Maughan as well as related entities AVA, Selective Art Inc.

2    (formerly Forever Living Products, Inc.), Forever Living Products International, and

3    FLPJ. In the letter, the IRS advised the NTA that a simultaneous examination could

4    discover evidence that the entities in each country were not reporting correct tax

5    liabilities.

6         The IRS attached its six-page Simultaneous Examination Proposal to the letter.

7    Part I of the SEP identifies the U.S. and Japanese entities to be subjected to examination,

8    lists the tax years involved (1991 and 1992), states that the IRS examination is already in

9    progress, and proposes that the simultaneous examination begin in May 1996 and

10   conclude by December 1996.

11        Part II of the SEP contains a factual background, including prior tax liability

12   history, of the entities proposed to be examined, a list of the principal factual and legal

13   issues, a list of the type and volume of information expected to be sought through the

14   IRS-NTA exchange of information, and a description of information and documents

15   obtained. The background section describes the ownership structure of FLPJ as 50% by

16   Maughan and 50% by Yamagata; it also lists a prior exchange of information between the

17   IRS and the NTA concerning tax years prior to 1991, the result of which was the

18   disallowance (it is unclear by whom) of certain royalty payments "accrued to Forever

19   Living Products (U.S.) and Batrax Rotterdam BV." The factual and legal issues section

20   describes the structure and tax treatment of royalty payments made in the 1987 through

21   1990 tax years by FLPJ to Batrax Rotterdam BV ("Batrax") for the benefit of Maughan

22   and Yamagata; FLPJ included these payments in its cost of goods sold despite their

23   payment to trusts for the benefit of Maughan and Yamagata. In particular, the SEP states

24   that "[t]he monies sent through Batrax for the benefit of Mr. Yamagata have been

25   reported by Mr. Yamagata on his U.S. income tax returns but the monies sent through for

26   Mr. Maughan have not been reported in the United States."[9] Part II also mentions

27   _____

28   [9] This statement was false with respect to Maughan. Smith knew Maughan had
     reported this income but inadvertently stated that he had not done so.

1    commissions paid by FLPJ to Maughan and Yamagata and the IRS asserts that these

2    commissions, despite FLPJ's classification as part of cost of goods sold, are in the nature

3    of dividends to shareholders.

4        Part III of the SEP contains an estimate of the potential additional tax to Japan and

5    the U.S. that could be assessed as a result of the simultaneous examination. (Although

6    Part III is at the core of this case, the Court has already block-quoted Part III in its

7    preceding discussion of the SEP's development and will not repeat it here.)

8                    **3.     Simultaneous Examination Meetings**

9        The NTA accepted the SEP, and on August 5-7, 1996, the IRS and NTA held a

10   simultaneous examination meeting in Phoenix, Arizona.[10] Smith, Mason, and Warner

11   were present, along with other IRS officials including Pat Sturgis, a domestic Group

12   Manager working on the audit of the Maughans. During this meeting, the tax agencies

13   exchanged information including tax return information of some Plaintiffs. Both Warner

14   and Sturgis took notes of this meeting.

15       At one point during the meeting, Smith stated that the cost to FLPJ of raw aloe

16   vera gel changed over time while commissions to Maughan and Yamagata remained

17   constant.[11] This statement was memorialized in the notes of Sally Warner as:

18           Rick Smith commented that the U.S. team feels they are
19           doing other things in other countries because their sales are
             going up and net income is going down. Rick also stated that
20           through the years the sales price of the product changed quite
             a bit. The commission always stayed the same.

21

22       It was memorialized in the notes of Pat Sturgis as:

23           Cost of product to Japan changed over the years from over
             $30 to $15 approx. but commissions always stayed the same
24           at $8.10.

25

26   [10] This was the third simultaneous examination ever conducted between the U.S. and Japan.

27   [11] Smith does not remember making this statement. The Court finds that the notes
28   of Sturgis and Warner, combined with their admitted weaknesses in the quality of their
     notes, are insufficient to support a finding that Smith made this statement with any
     greater specificity (such as specifying a particular time period).

This statement was false, although Smith does not remember making this statement. Smith now recognizes that the statement was false, but at the time of presenting to the NTA at the meeting, did not intend to make such a false statement.

After the meeting concluded, the IRS and NTA exchanged approximately two hundred pages of documents containing tax return information that had been requested during the meeting.

The IRS and NTA held a second simultaneous examination meeting on November 13-15, 1996 in Tokyo, Japan. At this meeting, the IRS disclosed additional information and documents containing tax return information of some Plaintiffs.

C.     IRS and NTA Assessments

In October 1996, the NTA initiated an audit of FLPJ for the 1991-95 tax years. FLPJ had calculated its net income by deducting from sales its cost of goods sold (which reflected FLPJ's cost of purchasing AVA's product). The NTA recharacterized FLPJ's cost of goods sold by classifying part of it as nondeductible director bonuses and assessing a "heavy penalty" (akin to a fraud penalty) for FLPJ's failure to report the director bonuses.[12]

FLPJ met with the NTA numerous times from October through December 1996 concerning this audit. At these meetings, FLPJ attempted to convince the NTA that under transfer pricing principles[13] the amount charged by AVA to FLPJ was the correct, marketable price for the raw aloe vera gel. However, at the December meeting, the NTA reiterated that they did not agree with FLPJ; they were going to recharacterize a portion of the cost of goods sold as director bonuses and assess a heavy fraud penalty.

FLPJ expected the proposed assessments to amount to approximately $80 million. It did not have the funds on hand, and the assessments had to be paid before FLPJ could

_____

[12] Under Japanese tax law, annual bonuses or other non-monthly payments to directors are nondeductible director bonuses.

[13] Transfer pricing concerns setting an appropriate price for goods sold between related entities such that income is not shifted from one entity to another for purposes of avoiding tax.

challenge their validity. Rick Toma, FLPJ's country manager, contacted two of FLPJ's banks (Asahi and Sanwa) to inquire whether FLPJ could obtain a loan to pay the assessments. Toma also shared the details of the proposed assessments with approximately one hundred FLPJ employees, forty general managers, and ten President's Club Members.[14] Although FLPJ also drafted two press releases concerning the assessments, it never issued them.

On January 20, 1997, the NTA issued correction notices to FLPJ for tax years 1991-95. These notices assessed additional tax, including penalties and interest, of approximately 8 billion Japanese yen (approximately $73 million). In the correction notices, the NTA recharacterized a portion of FLPJ's cost of goods sold as nondeductible director bonuses because AVA paid this amount to Maughan and Yamagata, and this thus represented director compensation. FLPJ took out bank loans to pay these assessments.

On February 5, 1997, the IRS assessed AVA additional tax for tax years 1991 and 1992. The IRS disallowed AVA's deduction for commissions included in the sales price of aloe vera gel to FLPJ and paid by AVA to Maughan and Yamagata, finding that these commissions were not ordinary and necessary business expenses of AVA.

FLPJ, AVA, Maughan, and Yamagata immediately challenged the IRS's and NTA's assessments. In March 1997, the FLP Group requested the U.S. Competent Authority's assistance with the IRS and NTA assessments. The U.S. Competent Authority took the position that the NTA's correction notices resulted in double taxation of FLPJ and AVA, a result that the tax treaty with Japan seeks to avoid. AVA also appealed the IRS's disallowance of the deduction for commissions paid to Maughan and Yamagata.

In August 1997, the IRS appeals office conceded AVA's deductions for commissions paid by AVA to Maughan and Yamagata. Specifically, the IRS determined that the commissions paid by AVA to Yamagata and Maughan were ordinary and

---

[14] FLPJ designates certain distributors as "President's Club Members" based upon their sales volume.

necessary business expenses of AVA. However, the NTA maintained its position concerning FLPJ with respect to the 1991-95 tax years and also extended its position to the 1996 tax year.

In late 1997, the NTA initiated an audit of FLPJ for the 1996 tax year. As with the 1991-95 years, the NTA recharacterized a portion of FLPJ's cost of goods sold as a nondeductible director bonus and assessed a heavy fraud penalty. This proposed assessment was for approximately $20 million.

On October 6, 1997, FLPJ met with the NTA[15] concerning the 1996 audit. FLPJ told the NTA that they were challenging the previous assessments, they were meeting with the U.S. Competent Authority, and they had successfully contested the IRS's disallowance of AVA's deduction for commissions. The NTA official was surprised to learn that AVA had successfully challenged the IRS's disallowance of those deductions. The NTA did not change their position at this meeting.

### D.   The October 1997 Media Reports

#### 1.   Content

On October 9-10, 1997, a series of news reports appeared in the Japanese media concerning FLPJ. One report appeared in the television news program of NHK, a Japanese broadcaster, and was followed by a number of articles in widely-circulated newspapers. These reports varied slightly in content, but essentially conveyed the same message as translated and summarized: As the result of a simultaneous tax examination between the NTA and the United States, Forever Living Products Japan, the Japanese arm of a multinational enterprise involved in the manufacture and sale of aloe vera products, has been found to have concealed more than 7.7 billion yen of income by inflating the price of raw aloe vera. The NTA assessed an additional tax of 3.5 billion yen against FLPJ, including a "heavy penalty tax." The simultaneous examination was based on information from U.S. tax authorities that FLPJ concealed its income. FLPJ greatly

---

[15] Specifically, FLPJ met with the Tokyo Regional Taxation Bureau ("TRTB"), a local division of the NTA.

padded the purchase price of raw aloe vera for the purpose of reducing its income. The concealed income was remitted to FLPJ's affiliate in the U.S. When the U.S. tax authorities examined FLPJ's affiliated company, they determined that the directors of the U.S. affiliate had used the remitted funds for their own personal use and assessed an additional tax. The simultaneous examination system under which the NTA and U.S. carried out this investigation was initiated in 1986 for the purpose of preventing tax evasion by organizations operating in both countries.

## 2.   Source

There is conflicting evidence concerning the source of information for the media reports. The media reports did not identify the source of their information by a formal name. Each of the media reports used particular language (for example, the terms "kankeisha" and "wakatta") to identify the source of the information contained in the report. These Japanese terms have a cultural meaning beyond their literal definitions when used in the media; they indicate that the source is the most authoritative and direct source of information. In the context of an article concerning tax assessment, these terms mean the NTA. Based upon these Japanese journalistic practices and the taxation subject of the article, each of the media reports specifically identifies the NTA as the source of information.

Furthermore, each of the newspapers who published a report on FLPJ was a member of a NTA press club, through which the NTA disseminates information. The media reports also contained facts not known to FLPJ, such as the fact that the simultaneous examination began in 1996 and the number of previous simultaneous examinations between the NTA and the IRS.[16] Moreover, as of October 1997, the NTA had a custom in domestic tax matters of leaking information to the media for the purpose of shaming large or famous tax evaders. This was done to deter other tax evaders by causing the public to feel morally compelled to comply with the tax code.

---

[16] The articles are not consistent concerning this number, but it was unknown to FLPJ.

U.S. Competent Authority Lyons took the position that the source of the media reports could neither be proven nor disproven to be the NTA, but the IRS also created a document for its internal use titled "Aloe Vera of America, Inc. / Summary of Case Events" in which it stated that the "NTA leaked information to the Press concerning their audit of FLPJ."

The IRS had previously received complaints from taxpayers and practitioners concerning Japanese disclosures of taxpayer information to the press, but according to U.S. Competent Authority Lyons, none of these were ever proved to be more than rumor. Some IRS officials had privately expressed to Lyons that NTA leaks to the media appeared to happen on every high-profile case, but Lyons never saw proof of such leaks as the NTA always denied leaking any information. One IRS official, however, was specifically aware prior to October 1997 of more than one leak to the Japanese media of confidential tax information; he knew that a transfer pricing examination as well as results of an NTA proposed adjustment had been disclosed in the Japanese media.

There were six instances between October 1, 1987 and September 30, 1996 where the Competent Authority investigated the potential disclosure by the NTA of taxpayer information.[17] None of these were from simultaneous examinations, and none resulted in the Competent Authority concluding that the NTA had leaked taxpayer information. Lyons had heard rumors that the Japanese media had a permanent presence in NTA headquarters, but the NTA had denied this to the IRS and insisted that it knew its responsibilities.

Following the media reports, the IRS temporarily suspended the exchange of taxpayer information with Japan. The IRS's internal e-mail announcing this suspension cited as reasons the past instances of the NTA's improper disclosure of taxpayer information as well as the specific allegations in this particular case. The IRS later lifted this suspension after the NTA took steps aimed at preventing any further disclosures of

---

[17] During the same time period, the IRS disclosed taxpayer information to the NTA approximately 400,000 times.

treaty information.

In connection with discovery in this case, thirteen current and former NTA officials involved in the simultaneous examination have stated under oath that they did not personally know the source of the media reports. However, the NTA refused to allow its officials to answer questions regarding the investigation into the source of the leak.

Prior to the media reports, FLPJ disclosed its NTA assessments to approximately 150 individuals associated with FLPJ as well as to two banks (Asahi and Sanwa).[18] None of these individuals have ever denied under oath being the source of the media reports. Other FLP Group employees, such as AVA's vice president of taxes and Forever Living Products International's controller knew of the simultaneous examination in 1996 but have never been asked if they were a source of the media reports. FLPJ never asked its employees, general managers, or President's Club Members if they were the source of the media reports. Six days after the media reports, Japanese counsel for FLPJ opined in a letter to Plaintiffs' counsel that there was no evidence the NTA leaked the information to the media and Plaintiffs would thus have to ask the NTA whether it was the source.

Considering and weighing all of the evidence, the Court finds that the NTA leaked information to the Japanese media concerning the NTA assessments. The NTA was the source for the October 1997 media reports.[19]

---

[18] *See supra* section II.C.

[19] This finding rests, in part, upon the expert testimony of Professor Watanabe, who testified how the Japanese media uses certain words and phrases to indicate the source is reliable while not actually naming the source. Reducing Japanese culture, with which the Court is not natively familiar, to a series of simple statements to be considered a trial is a difficult challenge. It appears to the Court that the use of these words, such as "kankeisha," is vaguely similar to if, for example, a person answered a question while simultaneously winking one eye. In this example, the context of winking imparts a nonliteral meaning to an otherwise literal oral statement but this nonliteral meaning is conveniently deniable.

Significantly, the United States offered *no* controverting evidence or expert to rebut Watanabe's testimony, and did not succeed on cross-examination in undermining Watanabe's credibility to any significant extent. Nevertheless, Watanabe's testimony is not irreproachable, and the Court would not conclude the NTA was the source of the leak beyond a reasonable doubt. But when combined with the other evidence in the record, the Court is definitely and firmly convinced by a preponderance of the evidence that the NTA was the source of the leak.

1       **E.      Effects from the Media Reports**

2       The media reports had immediate, negative effects upon FLPJ's reputation and

3   sales. FLPJ held a number of meetings with its distributors to explain its position and

4   show how the payments that were the subject of the media reports were in fact being

5   taxed in the United States. Nevertheless, the media reports tarnished FLPJ's image with

6   its distributors and the public, some of whom no longer wished to do business with a

7   company that they considered to be a tax evader.

8       Plaintiffs' expert, Dr. Steven Schwartz, testified extensively as to the negative

9   effects of the media reports upon FLPJ's sales. The Court need not discuss the details of

10  his otherwise overwhelmingly credible testimony because a necessary step in Dr.

11  Schwartz's damages calculation was to convert lost FLPJ sales into AVA profits by

12  applying AVA's incremental profit margin for sales of aloe vera gel to FLPJ. Rjay Lloyd,

13  who holds a management position with the FLP Group, supplied Dr. Schwartz with a

14  figure of 68% for AVA's incremental profit margin and asked him to assume that it was a

15  proper profit margin.

16      Dr. Schwartz has no knowledge as to whether this 68% figure was correct or

17  reasonable, he did not analyze it, and his expert opinion does not extend to its truth or

18  accuracy. He asked for the data underlying the 68% figure, but never received it from

19  Plaintiffs. In fact, Lloyd declined to give Dr. Schwartz documentation supporting the

20  profit margin figure. AVA's actual incremental profit margin is unknown.

21      However, the media reports had a statistically significant negative effect upon

22  FLPJ's sales beginning in October and November 1997, which negatively affected

23  AVA's sales as well as commissions paid to Maughan and Yamagata. This negative

24  effect lasted until 2003.

25      **F.      Reversal of the NTA Assessments**

26      As part of FLPJ's contest of the NTA assessments, it obtained a bilateral transfer

27  pricing study regarding the sale of raw aloe vera gel between AVA and FLPJ. In the

28  study, the competent authorities for the U.S. and Japan ultimately agreed that AVA

1  charged FLPJ the correct market price for raw aloe vera gel. The tax authorities

2  retroactively applied the results of the transfer pricing study to tax years 1991 through

3  1996.

4          The NTA refunded $100 million to FLPJ. This refund represented a complete

5  victory for FLPJ and a vindication of the position it had taken with respect to the tax

6  issues before the NTA.

7  **III.    Analysis & Conclusions of Law**

8          Plaintiffs' only operative claims in this case are those in Count I of their Third

9  Amended Complaint. *Aloe Vera*, 699 F.3d at 1166. The Court has jurisdiction over these

10  claims, as determined by the Court of Appeals' opinion and the statutes cited therein. *See*

11  *id.* In Count I, Plaintiffs allege that the United States is liable under 26 U.S.C. § 7431 for

12  knowingly providing false tax return information of Plaintiffs to the NTA. There are two

13  alleged disclosures at issue. First, Part III of the SEP estimated that there was unreported

14  U.S. income of approximately $32 million for tax years 1991 and 1992. This is the

15  "Unreported Income Statement." Second, during the first simultaneous examination

16  meeting in August 1996, international examiner Smith stated in a presentation to the

17  NTA that commission payments by AVA to Maughan and Yamagata on sales of aloe

18  vera product to FLPJ remained unchanged over the years while the price of raw aloe vera

19  gel changed. This is the "Commission v. Price Statement."

20      **A.    Liability**

21          To establish the United States' liability under 26 U.S.C. § 7431, Plaintiffs must

22  show that the United States disclosed Plaintiffs' return information to the NTA, this

23  return information was false, and the United States knew this return information was

24  false. *See* 26 U.S.C. §§ 7431(a)(1), 6103(a); *Aloe Vera*, 699 F.3d at 1164-65. The Court

25  finds, and the United States does not dispute, that the IRS disclosed the *contents* of the

26  Unreported Income Statement and Commission v. Price Statement to the NTA. In other

27  words, the IRS actually sent Part III of the SEP to the NTA, and Smith actually

28  commented to the NTA that commissions remained the same while prices varied. The

1    issue is whether these statements contained knowingly false return information of

2    Plaintiffs.

3                **1.**     **Return Information**

4        The United States does not dispute that the Unreported Income Statement and

5    Commission v. Price Statement contain return information of the Maughans and AVA,

6    but argues that they do not contain the return information of Yamagata, YHI, or MHI.

7    (Doc. 695 at 5; Doc. 700 at 1-2).

8                **a.**     **Legal Standard**

9        Section 7431 of the Internal Revenue Code provides that the United States is liable

10    for the knowing or negligent disclosure of "any return or return information with respect

11    to a taxpayer in violation of any provision of section 6103." 26 U.S.C. § 7431(a)(1).

12    Section 6103 provides that "return information" is confidential unless disclosure is

13    statutorily authorized and defines "return information" as including:

14
15
16
17
18
19
20

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense[.]

21    26 U.S.C. § 6103(b)(2)(A); *see also* 26 U.S.C. § 7431(f) ("For purposes of this section,

22    the term[] . . . "return information" [has] the respective meaning[] given . . . by section

23    6103(b)").

24        "Taxpayer information obtained or prepared by the IRS . . . is 'return information'

25    regardless of the person with respect to whom it was obtained or prepared." *Aloe Vera*,

26    699 F.3d at 1157 (quoting *Mallas v. United States*, 993 F.2d 1111, 1118 (4th Cir. 1993)).

27                **b.**     **Analysis**

28        The United States argues that the neither the Unreported Income Statement nor the

Commission v. Price Statement contained tax return information of Plaintiffs Yamagata, YHI, or MHI because the statements do not suggest that they are such return information and Smith, who authored both statements, did not review the tax returns of Yamagata, YHI, or MHI. (Doc. 695 at 5).

But the Unreported Income Statement cannot be read in a vacuum. Although the only entities explicitly listed in the SEP as being under examination were the Maughans, AVA, and related entities Selective Art, Inc. and Forever Living Products International, the purpose of the SEP was to connect this unreported U.S. income to unreported Japanese income. The SEP did so in the context of explaining that Maughan and Yamagata were equal owners of FLPJ and had allegedly used Batrax for the purpose of evading U.S. income taxes. The SEP mentions that Maughan and Yamagata receive a commission on every gallon of aloe vera gel sold by AVA to FLPJ and then asserts that FLPJ is inflating its cost of goods sold by improperly including this commission. The figures in Part III of the SEP for unreported U.S. income exactly equal the sum of the figures for proposed disallowances by Japan of royalty and commission expenses. The SEP identifies commissions to Maughan and Yamagata as the source of increased tax liability for FLPJ. FLPJ is owned by MHI and YHI, which are wholly owned by Maughan and Yamagata, respectively.

The Unreported Income Statement contained the return information of Maughan and Yamagata for two reasons. First, because the statement concerning $32 million of unreported U.S. income directly implied increased tax liability for FLPJ and FLPJ's tax liability was borne by its owners MHI and YHI, which as S corporations in turn placed this liability on Maughan and Yamagata, this statement was data prepared by the IRS with respect to the "determination of the existence, or possible existence, of liability (or the amount thereof)" of tax for Maughan and Yamagata. *See* 26 U.S.C. § 6103(b)(2)(A). Second, and independently, because the statement concerning $32 million of unreported U.S. income was preceded by the detailed explanation in Part II of the SEP concerning the commissions paid to both Maughan and Yamagata and how these commissions had

previously been paid to Batrax for the purpose of evading U.S. taxes, and because the $32 million unreported U.S. income statement did not specify or limit to which taxpayer it applied, the statement implied that Maughan and Yamagata had unreported commission income taxable by the U.S. in the amount of $32 million.[20] Such an implication would be the deficiency of a taxpayer as well as data prepared by the IRS with respect to the "determination of the existence, or possible existence, of liability" of tax for Maughan and Yamagata. Thus, the Unreported Income Statement contains return information of AVA, the Maughans and Yamagata.[21]

The Commission v. Price Statement also contained the return information of Maughan and Yamagata. The statement and its context suggested that because the commissions to Maughan and Yamagata did not change as the cost to FLPJ of aloe vera gel changed, either the amount of the commissions or their tax treatment as deductible commissions was improper. As with the Unreported Income Statement, because the commissions deducted by AVA were also included in FLPJ's cost of goods sold, and FLPJ's tax liability passed through to Maughan and Yamagata, the Commission v. Price Statement constituted data prepared by the IRS with respect to "the determination of the existence, or possible existence, of liability (or the amount thereof)" for tax for Maughan and Yamagata. *See* 26 U.S.C. § 6103(b)(2)(A).

---

[20] The United States argues that Smith testified that "in making the $32 million unreported income estimate, he had not gotten as far as trying to attribute that amount to Maughan or Yamagata." (Doc. 695 at 5). But it is precisely Smith's failure to limit the estimate in the SEP to only Maughan that defeats the United States' argument. The explicit and implicit assertions contained within the Unreported Income Statement clearly encompass both Maughan and Yamagata.

Similarly, the fact that Smith had not reviewed Yamagata's returns is irrelevant because Smith's preparatory work (or lack thereof) before drafting the Unreported Income Statement does not bear on a determination of what the Unreported Income Statement actually stated and disclosed.

[21] The Court does not conclude that the Unreported Income Statement contains return information of MHI and YHI because as S corporations, their tax liabilities passed through to Maughan and Yamagata, respectively. The Court relies on this characteristic of S corporations to conclude that tax liabilities to FLPJ are liabilities of Maughan and Yamagata; it would be incongruous to conclude that these same pass-through entities also have independent return information when they have no independent tax liability.

The United States makes two further arguments. First, it argues that because the amount of the commissions paid by AVA to Maughan and Yamagata and the price charged by AVA to FLPJ for aloe vera gel "is readily derived from AVA's books," it cannot be the return information of any other person. (Doc. 695 at 5). The Court of Appeals has held in this case that the source of return information is irrelevant to determining whether it is protected under 26 U.S.C. § 6103. *See Aloe Vera*, 699 F.3d at 1157. That return information of Maughan and Yamagata could be gleaned from AVA's books does not negate the plain language of the statute. To hold to the contrary would eviscerate the protections of section 6103. For example, the IRS could inspect the books of a partnership to ascertain the income received by its partners and then make unauthorized disclosures of the partners' business income without such disclosure constituting the partners' return information, simply because the information was readily obtainable from the partnership records. This result would undermine the protections Congress intended to provide in section 6103.

Finally, the United States argues that *Mallas v. United States*, 993 F.2d 1111 (4th Cir. 1993), upon which the Court of Appeals relied in the instant case, stands for the proposition that "only the person with respect to whose liability the information was collected can sue for an unauthorized disclosure of that information." (Doc. 700 at 1). The United States misreads *Mallas*. Although the court in that case noted in *dicta* that disclosures of the appellants' financing scheme contained information "collected by the Secretary" under section 6103 because the details of the scheme were derived from the IRS's criminal investigation of the appellants, the court did not limit section 6103's broad definition of "return information" to only information collected from the taxpayer. *See* 993 F.2d at 1118-19. The United States' interpretation of *Mallas* would obliterate the majority of the numerous disjunctive conditions qualifying as return information, in contravention of the plain language of the statute.

Accordingly, both the Unreported Income Statement and the Commission v. Price Statement contained return information within the meaning of section 6103 of AVA, the

Maughans, and Yamagata.

## 2. Knowingly False Return Information

The United States argues that the Unreported Income Statement and the Commission v. Price Statement were not false statements. (Doc. 695 at 2-3). With respect to the Unreported Income Statement, the United States contends that it was neither false nor knowingly false because as a good-faith estimate of *possible* unreported income, an estimate cannot be false and Smith did not know the estimate could not be true. (*Id.* at 3).

The Court finds Smith to be a highly credible witness. Smith testified that he suspected the FLP Group could have unknown aloe vera farms that used a Batrax-like entity to avoid reporting U.S. income. Smith also testified such unreported income might not exist, and he could not provide a numeric estimate of such income because its existence and extent were completely unknown. Smith testified that his IRS superiors essentially forced him to include numbers in the SEP, over his protests. Smith testified that he used aloe vera sales to generate an estimate of unknown aloe vera farms and unknown entities, and that he did not base this estimate upon actual calculations of commission income paid to Maughan and Yamagata. Smith testified he knew of no actual unreported income at the time he drafted his estimate, he believed the amount "couldn't be quantified," and he knew his explanation that the estimate was based upon aloe vera gel sales was inaccurate. Smith testified that his estimate was a *potential* estimate of unreported income but he did not believe that Maughan and Yamagata actually had $32 million of unreported income.

Had Smith's estimate been $32 billion instead of $32 million, it would have also been a *potential* estimate of unreported income. $50 million, $1, and $234.3 million would also have been *potential* estimates of unreported income because any unknown unreported income *could* have existed in these amounts. But the fact that a number is described as an estimate does not mean that it can never be objectively false. Although the nature of an estimate is such that the estimate does not guarantee that the true value of the thing being estimated will equal that predicted in the estimate, the estimate does carry

an implied assertion that its author knows facts that justify the selection of the particular value chosen as the estimate. Blind guesses are not good faith estimates.

The Court of Appeals has previously rejected the United States' argument on this point, holding that "even an estimate can be objectively false if, for example, the communicator knows it *cannot* be true." *Aloe Vera*, 699 F.3d at 1164. "[A]n opinion or estimate carries with it an 'implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it.'" *Id.* (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999)). The Court of Appeals also held that "[m]ore importantly, the question in this case is not the amount of the estimate, but whether Taxpayers had accurately reported the information."

The IRS had no basis whatsoever for its estimate that there was $32 million of unreported income. The uncontroverted testimony of Smith, the former IRS international examiner, shows that this figure was an unfounded guess for which Smith knew there was no basis. Moreover, Smith knew the figure could not be true because he knew he had no information to justify the selection of $32 million as the estimate versus any other dollar amount. The $32,116,000 estimate for tax years 1991 and 1992 contains at least five significant digits (32116), carrying with it an implied assertion that the IRS knew facts enabling it to compute the estimate with this degree of precision. Such facts did not exist, and the IRS knew they did not exist. Additionally, the IRS knew of no inaccuracies in Plaintiffs' tax returns. The Unreported Income Statement was false and the United States knew it was false.[22]

---

[22] The United States argues that Plaintiffs fail to show that the $32 million estimate of unreported U.S. income was connected to unreported royalties and commissions of Maughan and Yamagata. (Doc. 700 at 2). First, the fact that the amounts for tax years 1991 and 1992 of unreported U.S. income equal the amounts to be disallowed by Japan for royalty and commission expenses undermines the United States' argument. Second, even if this equality were not the case and accepting the United States' argument as true, Smith's testimony clearly shows that the United States had no basis whatsoever for the $32 million figure—be it from royalties, commissions, or any other payments of money. In fact, the evidence shows that the IRS purported the figure to be based upon the sales of raw aloe vera gel.

With respect to the Commission v. Price Statement, there is no evidence suggesting that Smith knew at the time of making the statement that it was false. The only relevant evidence bearing on Smith's knowledge concerning falsity is Smith's own testimony. The Court finds Smith to be a highly credible witness who, throughout his testimony, freely admitted to shortcomings in his memory due to the age of this case. Smith admits that the Commission v. Price Statement is false. He does not remember making the statement, but clearly and credibly testified that he did not intend to make such a false statement. In the absence of any other evidence bearing on Smith's intent at the time of making the statement, it appears that Smith's statement was at most negligent, but not intentional. The United States did not know the Commission v. Price Statement to be false at the time Smith uttered it.[23]

### 3. Conclusion

For the foregoing reasons, the Court concludes that with respect to the Unreported Income Statement the United States disclosed to the NTA the return information of each of Plaintiffs AVA, the Maughans, and Yamagata; this return information was false; and the United States knew this return information to be false at the time of its disclosure. The knowing disclosure of false return information is unauthorized by the tax treaty with Japan. *Aloe Vera*, 699 F.3d at 1163-64. Thus, the United States is liable to Plaintiffs AVA, the Maughans, and Yamagata, under 26 U.S.C. § 7431(a)(1) for the unauthorized disclosure of the Unreported Income Statement.

With respect to the Commission v. Price Statement, Plaintiffs cannot show that the United States knew the statement to be false, and therefore the United States is not liable to Plaintiffs for the disclosure of the Commission v. Price Statement.

### B. Damages

Section 7431(c) provides that a taxpayer whose return information was the subject of unauthorized disclosure by the IRS is entitled to either statutory damages of $1,000 per

---

[23] Because the United States did not know the Commission v. Price Statement was false, the Court does not decide whether the statement was actually false.

unauthorized disclosure or actual and punitive damages. 26 U.S.C. § 7431(c).

### 1.    Actual and Punitive Damages

Plaintiffs ask the Court to award $52 million in actual damages, consisting of $47 million in economic damages resulting from the media reports and $5 million in attorneys' fees incurred to defeat the NTA assessments. Section 7431 provides that a plaintiff is entitled to "actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure" of return information. 26 U.S.C. § 7431(c)(1)(B)(i). Establishing actual damages under section 7431(c) requires Plaintiffs to prove both actual and proximate causation. *See Nat'l Org. for Marriage v. United States*, 24 F. Supp. 3d 518, 529 (E.D. Va. 2014) (citing *Jones v. United States*, 9 F. Supp. 2d 1119, 1137 (D. Neb. 1998)).

Plaintiffs fail to prove that the Unreported Income Statement caused the NTA to enter into the simultaneous examination. Actual causation is factual causation and requires a plaintiff to "prove that 'but for' the wrongful act, the harm would not have occurred." *Id.* (quoting *Jones*, 9 F. Supp. 2d at 1137). The SEP contained numerous detailed statements and allegations concerning Plaintiffs' business structure, income sources, and tax liabilities. If the Unreported Income Statement had not been made and Smith had instead left in his original values of "unknown" for U.S. unreported income and potential additional tax to Japan, the SEP still contained its provocative allegations that Maughan and Yamagata were hiding income from the United States and possibly Japan as well as hiding dividends as "commissions" in the cost of goods sold to avoid Japanese withholding tax. These allegations were a sufficient basis for Japan to enter into the simultaneous examination.

Plaintiffs point to the NTA's correction notices as evidence of causation, arguing that these notices adopted the "substance over form" recharacterization suggested in Part III of the SEP. (Doc. 696 at 8-9). But even if the NTA's recharacterization of FLPJ's cost of goods sold as nondeductible director bonuses was a direct result of the SEP (and it seems likely this is true), this demonstrates causation only with respect to the other

statements in the SEP concerning commission income to Maughan and Yamagata. None of the NTA correction notices cite the $32 million Unreported Income Statement as a basis for the NTA's assessment decision.

Plaintiffs contend that because the IRS previously sent a letter to the NTA discussing many of the same issues later included in the SEP, this letter did not contain the Unreported Income Statement, and the NTA did not act on this letter, this tends to show that the addition of the Unreported Income Statement to the SEP was the cause of Japan's entrance into the simultaneous examination. (*Id.* at 9). This earlier letter outlined the ownership of FLPJ and Batrax, alleged that FLPJ was including commissions to Maughan and Yamagata in its cost of goods sold as a way to avoid withholding taxes and to reduce taxable income by overstating cost of goods sold, and questioned Yamagata's residency. The letter did not, however, contain the Unreported Income Statement or any other figures concerning potential additional tax liability. The letter requested extensive information from the NTA on topics involving Batrax.[24]

Plaintiffs point to this letter and the NTA's non-response as evidence that the Unreported Income Statement caused the NTA to enter into the simultaneous examination. (Doc. 696 at 9). It is plausible that had the NTA read that the unreported U.S. income was unknown instead of $32 million, it would not have chosen to enter into the simultaneous examination. Certainly large amounts of unreported taxes can be motivation to engage in an audit. But it is also plausible that the NTA was motivated to enter into the simultaneous examination as a result of the details of Maughan and Yamagata's income structure (i.e. Batrax, deferred taxes, and hidden commissions) and the Unreported Income Statement, as a mere estimate, was not itself sufficient motivation. In the absence of evidence, the Court can only speculate as to the NTA's motives.[25]

---

[24] The Court finds those facts contained in these three sentences but has not also included them in the findings of fact section because the Court cites this 1995 request only to address Plaintiffs' argument on this issue.

[25] Plaintiffs argue that the Unreported Income Statement caused the NTA to

The issue is one of the burden of proof, and Plaintiffs bear the burden of proving causation by a preponderance of the evidence. Plaintiffs attempt to shift this burden to the United States by citing *Liriano v. Hobart Corporation*, 170 F.3d 264 (2d Cir. 1999), which held that New York common law created a rebuttable presumption of actual causation when a defendant's negligent act "is deemed wrongful precisely because it has a strong propensity to cause the type of injury that ensued." 170 F.3d at 271. *Liriano* concerns a duty to warn under common law and is inapposite here. Section 7431 is a waiver of sovereign immunity that must be "construed strictly in favor of the sovereign" and not enlarged beyond its language. *Siddiqui v. United States*, 359 F.3d 1200, 1204 (9th Cir. 2004).

Plaintiffs must show that it is more probably true than false that the NTA entered into the simultaneous examination because of the Unreported Income Statement. This they simply cannot do.[26] Accordingly, Plaintiffs have failed to meet their burden of proving they incurred actual damages as a result of the Unreported Income Statement.[27] Because section 7431 "precludes punitive damages against the United States absent proof of actual damages," *Siddiqui*, 359 F.3d at 1204, Plaintiffs' claim for punitive damages also fails.

## 2.     Statutory Damages

Plaintiffs are entitled to statutory damages in the amount of $1,000 for each unauthorized disclosure of return information for which the United States is liable. *See* 26

---

conclude that the proposed simultaneous examination was a case of "vicious" tax evasion. (Doc. 701 at 3). As evidence, they point to the fact that two of the NTA officials at the simultaneous examination meetings had job duties that included working on "vicious tax evasion matters." This evidence does not support Plaintiffs' argument. Moreover, even if the Unreported Income Statement had caused the NTA to conclude that there was "vicious tax evasion," it does not automatically follow that the Unreported Income Statement caused the NTA to enter into the simultaneous examination.

[26] The Court has considered but not discussed two of Plaintiffs' arguments in response to the United States' post-trial brief because the Court instead rejects the United States' arguments on this point. *See* (Doc. 701 at 4) (factual accuracy of the NTA assessments and the NTA's "historical practice").

[27] Because Plaintiffs fail to show actual causation, the Court need not address proximate causation.

U.S.C. § 7431(c)(1)(A). In this case, the IRS made a single unauthorized disclosure, but that disclosure contained the return information of three persons/entities. Accordingly, AVA, the Maughans, and Yamagata are each entitled to $1,000 in statutory damages.[28]

### 3. Costs

Under section 7431, Plaintiffs are entitled to the "costs of the action." 26 U.S.C. § 7431(c)(2). Accordingly, Plaintiffs may file a bill of costs with the Clerk of the Court in accordance with Local Rule of Civil Procedure ("Local Rule") 54.1.

### 4. Attorneys' Fees

Plaintiffs may be entitled to an award of reasonable attorneys' fees against the United States under section 7431(c)(3). Ordinarily, the Court permits a party seeking fees to file, after entry of final judgment on the merits, a motion for attorneys' fees that discusses the movant's eligibility for fees, entitlement to fees under relevant legal authority, and reasonableness of the requested fees. *See* LRCiv 54.2(c). Any fee request by Plaintiffs will involve the compilation of voluminous billing records representing the nearly sixteen years of litigation in this case. Section 7431(c)(3) entitles a party to an award of fees against the United States in certain circumstances, but requires the Court to make certain determinations involving other sections of the Internal Revenue Code (such as whether Plaintiffs are the "prevailing party"). The Court believes it would be inefficient to require Plaintiffs to expend significant resources to file a motion for attorneys' fees when the entitlement to a fee award is presently unclear and such a motion could be denied.

Therefore, in the interests of efficiency, the Court will bifurcate any request for attorneys' fees. Plaintiffs may move within fourteen days from the date of this Findings of Fact and Conclusions of Law to establish legal entitlement to a fee award under section 7431(c)(3). The sole issue in such motion shall be whether Plaintiffs are legally entitled to an award of "reasonable attorneys fees" as that phrase appears in section

---

[28] The Court assumes Rex and Ruth Maughan are not each entitled to a separate award of statutory damages because at all relevant times their tax liability was jointly computed.

7431(c)(3); the motion must not address the amount of reasonable attorneys' fees. The United States' response and any reply by Plaintiffs shall be within the time limits specified in Local Rule 7.2.

The Court will then rule on Plaintiffs' motion and if it grants the motion, will at that time permit Plaintiffs to file a motion for an award of reasonable attorneys' fees. This second motion, response, and reply will comply with Local Rule 54.2(c) in all regards.

**IV.    Conclusion**

For the foregoing reasons,

**IT IS ORDERED** that the Clerk of the Court shall enter judgment for Rex and Ruth Maughan (jointly) and against the United States in the amount of $1,000 on the Maughans' claim for unauthorized disclosure under 26 U.S.C. § 7431(a).

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment for Aloe Vera of America, Inc. and against the United States in the amount of $1,000 on AVA's claim for unauthorized disclosure under 26 U.S.C. § 7431(a).

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment for Gene Yamagata and against the United States in the amount of $1,000 on Yamagata's claim for unauthorized disclosure under 26 U.S.C. § 7431(a).

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment for the United States and against Maughan Holdings, Incorporated on MHI's claim for unauthorized disclosure under 26 U.S.C. § 7431(a).

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment for the United States and against Yamagata Holdings, Incorporated on YHI's claim for unauthorized disclosure under 26 U.S.C. § 7431(a).

**IT IS FURTHER ORDERED** that Plaintiffs may, within fourteen days from the date of this Findings of Fact and Conclusions of Law, file a motion for a ruling that they are entitled to an award of reasonable attorneys' fees. Plaintiffs' motion must comply with the restrictions specified in this Findings of Fact and Conclusions of Law. Any response and reply are due within the time limits prescribed in Local Rule of Civil

Procedure 7.2.

Dated this 10th day of February, 2015.

James A. Teilborg
Senior United States District Judge